In the

# United States Court of Appeals
## For the Seventh Circuit
———————

Nos. 06-1381, 06-1488, 06-1555, 06-1601 & 06-1900

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/Cross-Appellant,*

*v.*

SHEILA THOMAS, JESSE LEWIS,
and KELVIN ELLIS,

*Defendants-Appellants,*

*and*

CHARLES POWELL, JR.,

*Defendant-Appellant/Cross-Appellee.*

———————

Appeals from the United States District Court
for the Southern District of Illinois.
No. 05 CR 30044—**G. Patrick Murphy**, *Judge.*

———————

ARGUED FEBRUARY 21, 2007—DECIDED DECEMBER 17, 2007

———————

Before EASTERBROOK, *Chief Judge*, and FLAUM and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. The defendants in this case—four Democratic precinct committeemen in East St. Louis, Illinois—were convicted of election fraud crimes for their participation in a vote-buying conspiracy during the November 2004 election. They argue on appeal that the evidence was insufficient to establish the existence

of a single conspiracy, and that the admission of a DVD of a political speech given by a key government witness was reversible error. We reject these arguments and affirm.

The government brings a cross-appeal regarding the district court's refusal to apply the two-level sentencing guidelines enhancement in U.S.S.G. § 3B1.3 for abuse of a position of trust by defendant Charles Powell, the chairman of the Democratic precinct committee in East St. Louis. Powell argued in the district court that the enhancement should not apply because the increased Democratic voter turnout brought about by the vote-buying scheme cannot have abused the trust of the Democratic Party, which would have desired that result. Who's to say, counsel argued at sentencing, "that the Democratic Party got anything less from Mr. Powell than what [it] expected?"

The district court did not fully credit this extraordinary argument but rejected the enhancement anyway, based on a variant of it; that is, the judge thought the government should have produced a Democratic Party official to establish that Powell was acting against the party's interests. This was unnecessary. One who uses a position of trust to commit a crime has necessarily abused that trust; the government need not prove actual harm to the interests of those whose trust has been abused. Stated differently, the enhancement presupposes greater punishment is justified based on the exploitation inherent in the use of a position of trust to commit a crime. This is so regardless of the type or degree of harm caused or the identity or even the existence of a victim. Here, Powell's coordination of the vote-buying scheme through his chairmanship of the local Democratic precinct committee significantly facilitated the commission of the crime and therefore was an abuse of a position of trust within the meaning of § 3B1.3 of the sentencing guide-

lines. Accordingly, we vacate Powell's sentence and remand for application of the enhancement and resentencing.

## I.  Background

Sheila Thomas, Jesse Lewis, Kelvin Ellis, and Charles Powell were charged with conspiracy to commit election fraud in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1973i(c).[1] All four defendants were Democratic precinct committeemen in East St. Louis, Illinois. Two also held leadership positions in the precinct committee: Powell was committee chairman and Thomas was committee secretary. According to the superseding indictment, the conspiracy existed for the purpose of "knowingly and willfully pay[ing] and offer[ing] to pay voters for voting in the [ ] November 2, 2004 general election . . . to secure the election of certain candidates for elective office whom the defendants and their co-conspirators favored . . . ." The indictment alleged that in the course of chairing committee meetings, Powell directed committeemen to submit election-day budgets to the St. Clair County Democratic Committee for funds to pay voters in their precincts to vote for Democratic candidates. The other defendants attended these meetings and participated in the vote-buying activities as directed. In addition to the conspiracy count, Thomas, Lewis, and Ellis were also charged with aiding and abetting election fraud in violation of 18 U.S.C. § 2 and 42 U.S.C. § 1973i(c) for paying and offering to pay voters on election day, November 2, 2004. The case proceeded to a 17-day jury trial on these charges. We summarize the key evidence below.

---

[1]  The indictment also included charges against Yvette Johnson, who did not proceed to trial and is not a party to this appeal.

## A. Rudy McIntosh

The bulk of the prosecution's case came from an informant named Rudy McIntosh, who at the time of the November 2004 election was a 12-year veteran of the East St. Louis Police Department and a newly elected Democratic precinct committeeman. He was working with the FBI on an unrelated investigation into certain committeemen; in connection with that investigation, he surreptitiously recorded an October 12, 2004 committee meeting chaired by Powell. During the meeting, the following discussion took place between Powell and the committeemen present:

POWELL: [I] got people in my precinct gonna' run over me to come in there to vote on . . .

UNKNOWN MALE: (Laughs).

POWELL: It's for the presidential election, you can't hold 'em at home, they gonna', knock me down runnin' up there to vote.

RUDY[2]: (Laughs).

POWELL: I ain't gotta give 'em nothin. Okay. Ain't gotta give 'em nothin. But what you do is there are people who you know expect something, you take care of 'em all the time because you gonna' need 'em all the time.

ELLIS: That's right.

POWELL: Now that's the strategy behind the business.

ELLIS: Yeah.

---

[2] The FBI transcripts of the recordings use last names for all individuals except the FBI informants.

> POWELL: You take care of 'em all the time because you gonna' need 'em all the time. Look at your voters records.
>
> LEWIS: Right, that's what I do.
>
> POWELL: And that's the purpose of handlin' it the way we do.
>
> UNKNOWN MALE: It sure is.
>
> POWELL: Now, if they expect somethin' and you don't give 'em nothing, they hold it against you for life. The rest of your life they'll hold it against you. (Laughter)

Later in the same meeting, Powell explained to committeemen how to prepare a budget to cover election-day voter payments:

> POWELL: Now if you're a hundred and fifty vote getter, add that one hundred and fifty times five dollars. Let me tell you how they [the St. Clair County Democratic Committee] figure it. They figure about five dollars a vote and they know you gonna' pay everybody who come vote. They know you don't spend that amount of money recruiting voters. They already know this but they're willing ta' pay it.

After this meeting, McIntosh spoke briefly about his election-day budget with Ellis, who acknowledged the vote-payment practice and encouraged McIntosh to "ask for the max" in that portion of his budget.

After hearing this recording, the FBI shifted its investigation to focus on the vote-buying activity in the Democratic precinct committee and worked with McIntosh to record additional meetings and conversations. One such conversation took place between McIntosh and Lewis on October 18, 2004:

> RUDY: . . . What are we payin' these people to vote? Now they in the other night talkin' about five dollars. I cain't see that.

LEWIS: Usually . . . well, I'm askin' 'em for fifteen hundred dollars . . . fuck that. I uh—, I, I normally . . .

RUDY: (Laughs).

LEWIS: . . . said thousand. Well, hey, I'm askin' for fifteen hundred. Them people don't take five dollars no more.

. . . .

LEWIS: Uh, you voted how many people last time and, when you ran?

RUDY: I got close to two hundred votes.

LEWIS: Yeah.

RUDY: Right at two hundred.

LEWIS: You should ask, you figure this time you got about two hundred fifty people.

RUDY: Easy.

LEWIS: Yeah. And ask for twelve hundred. Twelve hundred to fifteen hundred, whatever you can make your mouth say.

RUDY: Okay, but I'm sayin' at that poin', so what are we payin' 'em for each vote? That's . . .

LEWIS: You pay 'em what you wanna pay 'em? You pay 'em what, uh, you decide to pay 'em.

RUDY: Okay.

LEWIS: It ain't 'bout that.

RUDY: Okay.

LEWIS: But I'm sayin', you figure five dollars a vote, at two hundred and fifty dollars a vote. That's twelve hundred dollars, twelve hundred fifty dollars.

After the election McIntosh also recorded a conversation with Thomas, who had been present at the earlier committee meetings when the voter-payment plans for the November 2 election were discussed. This conversation took place on November 10, 2004:

> RUDY: Did they, 'eh, okay, so them people out there just blatant out voted for him or you had to take care of them. You had to pay them?
>
> THOMAS: We paid everybody.
>
>     . . . .
>
> THOMAS: Uh, Charlie [Powell's son] took care of the money part. Everybody schooled me on my little money thing and now on I take care of my own money thing.

In these and other recordings, the defendants referenced paying voters $5 or $10 to vote for Democratic candidates. Beyond the recorded conversations, McIntosh also testified about his own activities on election day and during the weeks preceding the election. During extensive cross-examination, McIntosh repeatedly contradicted himself and was discredited on many subjects. One such subject was his own campaign for township supervisor in the April 2005 local election, which took place shortly after the initial indictment in this case was returned and McIntosh's role in the investigation became publicly known. McIntosh was asked on cross-examination whether he had claimed during that election that the FBI was supporting him; he denied it. In response, the defense introduced a portion of a four-minute campaign speech during which McIntosh appeared to suggest that the FBI supported his candidacy. The government then asked that the entire DVD of the speech be admitted and played for the jury for purposes of providing context. The prosecutor contended that McIntosh's reference to the FBI was only meant to highlight the

ongoing FBI investigation and suggest that the FBI supported lawful elections in East St. Louis.

Judge Murphy accepted the government's characterization of the speech and allowed the DVD to be played for the jury in its entirety. When it became clear that the rest of the speech was about other campaign issues and had little to do with the prior inconsistent statements, Powell moved to strike all but the portion that had been used for impeachment. The judge reserved ruling, and parts of the taped speech were replayed during the balance of the trial.

## B.  Dannita Youngblood

The prosecution's other key witness, Dannita Youngblood, also recorded conversations with Democratic committeemen and those working with them in the November 2004 election. Youngblood was married to Kelvin Ellis's nephew, and around the time the voter-payment investigation was getting underway, she went to the FBI to report that Ellis was engaged in fraudulent activities in his job in the East St. Louis Office of Regulatory Affairs, where she also worked. Youngblood had worked with Ellis in a previous election, so the FBI asked her to record conversations while assisting him with his voter activities in the November 2004 election. In one of these conversations, Ellis is heard giving Youngblood specific directions about how to instruct and pay voters on election day. Ellis describes what Youngblood should tell voters about which candidates to choose (including, where necessary, teaching them how to spell "Democrat"), and then summarizes his payment instructions as follows:

> ELLIS: But I want them to initial that they understand [who to vote for].

> DANNITA: Okay they will initial on the precinct sheet. Or initial this?

> ELLIS: This. And you keep all those. Now why am I havin' them initial that?

> DANNITA: I don't know. Why?

> ELLIS: So when they come back.

> DANNITA: I can go in there and pay 'em. Okay.

> ELLIS: Uh huh.

> DANNITA: But that's gonna' be hard for me to keep, oh, that's gonna' be hard for me to keep up with.

> ELLIS: Uh huh. 'cause if their initials ain't nowhere they didn't see you, they don't see you they ain't got nothin' coming.

Ellis also cautioned Youngblood to use a fake name when dealing with voters.

In addition to the recorded conversations, Youngblood testified she was present at the precinct committee meetings at which the voter-payment budgets were discussed, and also testified that she saw Ellis personally pay numerous voters on election day. She testified about other activities Ellis and his precinct workers engaged in during the course of the election, including trying to obtain additional party funds to pay voters more than the going rate to vote for a particularly unpopular Democratic candidate, and mailing an anonymous racist letter to Republican precinct judges in an effort to discourage them from entering East St. Louis on election day.

## C.  Other Evidence

Although the recordings and testimony of McIntosh and Youngblood were the heart of the government's case, the

prosecution presented other evidence to corroborate the voter-payment scheme. The government introduced Thomas's grand jury testimony, in which she admitted attending the committee meetings chaired by Powell and submitting a voter-payment budget to him in accordance with the methods described at the committee meetings. Three voters testified to receiving payments from Powell or one of his precinct workers after voting in the November 2004 election. One voter testified to receiving a payment in Thomas's precinct, although he couldn't identify Thomas by name or face. Three witnesses testified to being present at the committee meetings chaired by Powell in the weeks prior to the election and said they understood Powell to be encouraging them to submit budgets for paying voters for their votes. One committee-man also testified that Powell brought a speaker to a 2002 precinct committee meeting to instruct committee-men how to pay voters without getting caught.[3]

FBI Agent John Jimenez also testified about his role in the investigation into the vote-buying conspiracy. He testified that he interviewed Lewis, who admitted to using his party election-day budget money to pay voters directly or buy them items such as cigarettes, alcohol, and medicine in exchange for voting. Jimenez also interviewed Powell, who attempted to explain away the $5- or $10-per-voter amounts that precinct workers were told to include in their election-day budgets. He initially said the $5 or $10 figure meant that each voter was considered an election worker. Later he said that amount actually represented $5 or $10 per household because one member of each household was responsible for ensuring all other

---

[3] As the indictment concerned only the 2004 election, this evidence was submitted for the limited purpose of demonstrating that Powell's activities and instructions had not been misunderstood.

members of the household voted. Powell then denied he ever directed or encouraged committeemen or party workers to pay voters for their votes.

### D. Conclusion of Trial

During closing argument, the government replayed the DVD of McIntosh's 2005 campaign speech. The defendants objected, and this time the judge held that the speech should not have been admitted in its entirety:

> The idea that this was just played to the jury to show context was ludicrous. What this is is an attempt to bolster the credibility of this particular witness by his bias[ed], self-serving, political statements. It has nothing to do with showing the context of the prior inconsistent statement. . . . [T]here is nothing I can do. The Court committed error.

The court gave the jury the following instruction on evidence of multiple conspiracies:

> You may judge the defendants only on the charges alleged in the Superseding Indictment. You may not convict them of any other conspiracy in the event you should conclude that they have engaged in some other conspiracy. Therefore, if you are not convinced beyond a reasonable doubt that a particular defendant knowingly and willfully joined the conspiracy alleged in the Superceding Indictment, you must find that defendant not guilty of the charge contained in Count 1.

> Even if you find that a particular defendant knowingly and willfully joined a conspiracy other than that alleged in the Superseding Indictment, you should, nevertheless, find that defendant guilty of the charge alleged in the Superseding Indictment if you

are convinced beyond a reasonable doubt that the defendant knowingly and willfully joined the single overall conspiracy that is alleged in the Superseding Indictment and the elements of which are otherwise contained in these instructions.

The defendants were convicted on all counts. They moved for a new trial on numerous grounds, all of which were rejected. On the issue of the DVD of McIntosh's campaign speech, the judge reiterated his conclusion that playing the DVD in its entirety was error as it "did not in any way explain or give context to the inconsistent statement. Rather, it was a self-congratulatory stemwinder of a political speech." There was no prejudice, however; the judge thought McIntosh had been so extensively and effectively cross-examined that the erroneous introduction of the campaign speech could not have made a difference in the jury's assessment of his credibility. In the district court's view, the case turned not on McIntosh's credibility but on the defendants' own statements in the recorded conversations.

### E. Powell's Sentencing[4]

Powell was the last defendant to be sentenced. He objected to the application of a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of a position of trust—an enhancement all his codefendants had received. Powell argued that the enhancement should not apply because his chairmanship of the East St. Louis Democratic precinct committee made him responsible to the Democratic Party, and he had not abused its trust because he acted in accordance with the party's interests by

---

[4] Only Powell challenges his sentence; we will not address the details of the other defendants' sentences.

increasing Democratic voter turnout. Initially the judge disagreed and said the enhancement would apply. Sentencing was then recessed to give Powell time to present a witness in support of a lower sentence.

When Powell's sentencing hearing resumed two weeks later, the issue of the abuse-of-trust enhancement was revisited. Powell's counsel reiterated his position that the vote-buying conspiracy did not amount to an abuse of the Democratic Party's trust:

> The Democratic Party sent money down there [to East St. Louis]. The Republican Party sent money down there. And they darn well know how that money is used, and with respect to poor people. . . . [T]here is nothing wrong with people voting, and, as a matter of fact, it should be encouraged. A reward was given. That's the evidence before you. A reward was given to people who exercised their franchise. Not only didn't [Powell] violate any trust, there is nothing immoral about what he did. . . . Okay, what is the trust? Who['s] to say . . . if [the prosecutor] wants to argue that [a trust was abused,] he should call Democratic Party officials to say we didn't give Mr. Powell the money for the reason that it be distributed.

After this argument, the judge announced he would not apply the § 3B1.3 enhancement after all:

> [A]s to the legal issue itself on whether the defendant should get the two points for the position of trust. I've changed my mind. He doesn't get it. . . . Whether it's a trust or not there's no showing that there was any breach of trust. The government has the burden on that. Somebody would have to come in here I suppose and say we didn't want Powell to do that. . . . In the alterative I note, too, that he has been marked up for being a leader and while he can be given points for both it is not required. And I just think that any

points he gets for a leader to include on top of that that he violated a position of public trust and it furthered the crime would be double counting, and he doesn't get it.

Removing the § 3B1.3 enhancement reduced Powell's advisory sentencing guidelines range from 27-33 months' imprisonment to 21-27 months' imprisonment. Powell was then sentenced to 21 months in prison, the bottom of the advisory range.

## II.  Discussion

Thomas challenges her convictions on three grounds: (1) there was a fatal variance between the indictment and the conspiracy evidence introduced at trial; (2) the district court committed reversible error in admitting the DVD of McIntosh's political speech; and (3) there was insufficient evidence to support her conviction for aiding and abetting election fraud. Powell, Ellis, and Lewis join Thomas's first two arguments. The government cross-appeals on the issue of Powell's sentence, arguing that the district court miscalculated the advisory sentencing guidelines range by refusing to apply the two-level enhancement in U.S.S.G. § 3B1.3 for abuse of a position of trust.

### A.  Variance and Sufficiency-of-the-Evidence Claims

"[A] conspiracy variance claim amounts to a challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy." *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991). As with all sufficiency-of-the-evidence claims, we consider the evidence supporting the charged conspiracy in the light most favorable to the government.

*See United States v. Handlin*, 366 F.3d 584, 589 (7th Cir. 2004).

The defendants maintain they were not all members of a single conspiracy because the evidence regarding Ellis's activities beyond the charged vote-buying conspiracy—such as trying to intimidate Republican precinct judges from coming to East St. Louis and seeking additional voter-payment funds to elect a particular unpopular Democratic candidate—did not implicate them. This does not establish a fatal variance from the indictment. " '[E]ven if the evidence arguably establishe[d] multiple conspiracies, there [is] no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment.' " *Townsend*, 924 F.2d at 1389 (quoting *United States v. Prince*, 883 F.2d 953, 959 (11th Cir. 1989)). The district court properly instructed the jury on the law regarding multiple conspiracies, *see United States v. Severson*, 3 F.3d 1005, 1011 (7th Cir. 1993), so the jury's verdict will stand as long as there is sufficient evidence to prove each defendant participated in the charged conspiracy—that is, the conspiracy to pay voters in East St. Louis on election day, November 2, 2004.

We begin with Powell. While chairing multiple Democratic precinct committee meetings in the weeks before the election, Powell spoke openly of how to "take care" of voters who "expect something" in exchange for their vote. He instructed committeemen how to calculate election-day budgets to be submitted to the St. Clair County Democratic Committee based on "about five dollars a vote" to "pay everybody who come vote." Committeemen present at those meetings testified that they understood Powell to be instructing them to use election-day budget funds from the Democratic Party to pay voters in their precincts to vote for the party's candidates, and many acted in accordance

with his instructions. Powell maintains he did not know he was being interpreted in this way, but this claim is utterly implausible—on its own, based on the words he used and context in which he spoke, and also in light of the corroborating evidence presented at trial. The latter includes: (1) the conflicting and unlikely explanations he gave the FBI about the use of election-day budget funds; (2) testimony that Powell himself paid people to vote in his precinct; and (3) testimony that he had presented a speaker at a 2002 precinct committee meeting to instruct committeemen how to pay voters without getting caught. The evidence against Powell was overwhelming, easily sufficient to support the jury's conclusion that he knowingly conspired with East St. Louis Democratic committeemen to pay voters for the purpose of increasing the vote for Democratic candidates in the November 2004 election.

The evidence against Lewis is also overwhelming. He was present and participated in the precinct committee meetings at which election-day budgets for vote buying were discussed. On one of the recordings he can be heard saying, "Right, that's what I do," in response to Powell's instructions about committeemen "tak[ing] care of" their voters. In another recording he instructs McIntosh: "You pay [voters] what you wanna pay 'em. . . . [Y]ou figure five dollars a vote." As if this were not enough, Lewis admitted to Agent Jimenez that he used his election-day budget money to pay voters or buy them items of value after they voted in his precinct. The evidence was more than sufficient to establish Lewis's participation in the East St. Louis vote-buying conspiracy in the November 2004 election.

The same can be said of Ellis. He was also present at the precinct committee meetings and can be heard on one recording agreeing with Powell's instructions about "taking care of" voters. During a recorded conversation with Youngblood, Ellis is heard giving her detailed directions about the precinct committee's vote-buying practices,

including specific instructions on how to keep track of voters who were entitled to payment: "[I]f their initials ain't nowhere they didn't see you [before voting], they don't see you [before voting] they ain't got nothin' comin." Although there was additional evidence about Ellis's involvement in other questionable election practices, the jury was properly instructed regarding evidence of multiple conspiracies, and the evidence establishing Ellis's participation in the charged vote-buying conspiracy was substantial.

Finally, ample evidence supports Thomas's conspiracy conviction. In her grand jury testimony, properly admitted at trial, Thomas admitted she was present at the precinct committee meetings in October 2004 at which Powell discussed the payment of voters and also acknowledged submitting an election-day budget in accordance with Powell's instructions. Thomas's recorded statements—"we paid everybody" on election day and "everybody schooled me on my little money thing and [from] now on I take care of my own money thing"—are not susceptible of an innocent explanation. Thomas also raises a separate challenge to the sufficiency of the evidence to support her conviction for aiding and abetting election fraud by paying voters in her East St. Louis precinct. We will "defer[ ] to the credibility determinations of the jury, and . . . overturn a verdict only when 'the record contains no evidence, regardless of how it is weighed, upon which a rational trier of fact could find guilt beyond a reasonable doubt.' " *United States v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005) (quoting *United States v. Starks*, 309 F.3d 1017, 1021 (7th Cir. 2002)). Thomas's grand jury testimony and recorded statements—"we paid everybody" and references to "my little money thing"—can only be understood as admissions that she paid voters to vote for the Democratic Party's candidates in the November 2004 election. Add in the testimony of the East St. Louis voters

who received payments from Democratic precinct com-mitteemen or volunteers working for them, and the evidence is easily sufficient to sustain Thomas's convic-tion for aiding and abetting election fraud.

## B. Admission of McIntosh's Political Speech

The defendants next maintain that the admission of McIntosh's full campaign speech constituted reversible error because it improperly bolstered McIntosh's testi-mony. Generally, improper bolstering occurs when evi-dence is introduced with the intent of lending official credibility to the government's witnesses or case. *See, e.g.*, *United States v. Cunningham*, 462 F.3d 708 (7th Cir. 2006) (admission of DEA agent's testimony regarding extensive procedural checks necessary to obtain a wiretap was reversible error because it improperly implied numerous other government officials believed the defendant guilty). The only portion of McIntosh's speech that comes even remotely close to lending him official credibility as a witness is the passage in which he suggests the FBI supported his candidacy, and this is the portion the *defendants* admitted as a prior inconsistent statement. The balance of the speech—that is, the part the defend-ants objected to—contains nothing but McIntosh's own self-serving statements about campaign issues com-pletely outside the scope of the trial.

Although these statements were irrelevant and hardly necessary for context, as the prosecution had suggested, we agree with the district court that they were not prej-udicial. McIntosh's credibility had already taken a beat-ing in a lengthy and effective cross-examination. Nothing about his political speech served to rehabilitate him as a witness. His main role in this case was to capture the defendants' conversations on tape and authenticate the recordings at trial; whether the jury found his inde-

pendent accounting of the recorded events credible was not nearly as important as the defendants' own words on the recordings. Indeed, although the district judge found it "impossible to imagine that the jurors credited Mr. McIntosh's testimony beyond what was absolutely compelled by other corroborated evidence," he correctly held that the erroneous admission of McIntosh's speech was harmless.

## C. Abuse-of-Trust Enhancement

The sentencing guidelines call for a two-level increase in offense level "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense . . . ." U.S.S.G. § 3B1.3. We review the district court's interpretation of § 3B1.3 de novo and its factual findings for clear error. *See United States v. Stewart*, 33 F.3d 764, 768 (7th Cir. 1994). The enhancement applies if Powell: (1) occupied a position of public or private trust; and (2) abused the position of trust to significantly facilitate or conceal the commission of the crime. *United States v. Andrews*, 484 F.3d 476, 479 (7th Cir. 2007).

As an initial matter, we do not share the district court's concern about double counting if both the abuse-of-trust *and* the leadership enhancements are applied. Powell received a leadership enhancement under U.S.S.G. § 3B1.1 for his role in the conspiracy; the guidelines explicitly contemplate that an abuse-of-trust enhancement may be applied on top of a leadership enhancement. *See* U.S.S.G. § 3B1.3 ("If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 [which includes leadership enhancements]."). Application of both cannot be considered double counting as long as each is warranted. The government did not seek the leadership

enhancement on account of Powell's leadership role in the *committee*, but rather on account of his leadership role in the *conspiracy*. Whether he used his position as chairman of the Democratic precinct committee to perpetrate this crime is distinct from his leadership role in the offense; these separate attributes of Powell's crime may result in separate offense-level sentencing enhancements.

Although the district court expressed some uncertainty regarding whether Powell held a position of public trust, there is no doubt he at least held a position of private trust as the elected chairman of the East St. Louis Democratic precinct committee. *See Andrews*, 484 F.3d at 479 ("The § 3B1.3 adjustment applies not only to public positions of trust, but also to private positions of trust."); *see, e.g.*, *United States v. Ellis*, 440 F.3d 434, 437 (7th Cir. 2006) (bishop holds private position of trust toward church); *United States v. Bhagavan*, 116 F.3d 189, 193 (7th Cir. 1997) (president of corporation holds private position of trust toward shareholders). It is clear as well that Powell used his position as chairman to instruct other committeemen to pay voters on election day and to submit budgets reflecting $5 or $10 per vote for that purpose. This "significantly facilitated" the offense within the meaning of § 3B1.3 by "ma[king] it substantially easier to commit or conceal the crime." *United States v. Sierra*, 188 F.3d 798, 802 (7th Cir. 1999).

Nonetheless, the district court rejected the enhancement on the theory that there was no proof that Powell *abused* his position of trust. Powell's counsel argued that the enhancement should not apply because the vote-buying conspiracy in the East St. Louis Democratic precinct committee was consistent with the interests of the Democratic Party in that it increased Democratic voter turnout. Judge Murphy initially rejected this argument but later changed his mind, believing that the government was

required to present testimony from a Democratic Party official to establish that Powell's activities were contrary to the party's interests. There is no such requirement in § 3B1.3. A position of trust carries with it an assumption that the person entrusted with the position will act in accordance with the law. Indeed, we have described a position of trust as one in which the defendant was "trusted [by others] to act in their interests *and in accordance with law*." *Andrews*, 484 F.3d at 480 (emphasis added). The enhancement presupposes that one who uses a position of trust to significantly facilitate the commission of a crime has abused that trust—that is, has acted contrary to the interests of those who have entrusted him with the position. Lawbreaking in the exercise of a position of public or private trust is necessarily an *abuse* of that position.

We have previously held that the abuse-of-trust enhancement "does not require a particular 'victim' relationship between the criminal and the person or group whose trust has been abused." *Ellis*, 440 F.3d at 437 (affirming enhancement for bishop who committed tax fraud despite evidence that his church benefitted financially from his actions); *see also United States v. Cruz*, 317 F.3d 763, 766 (7th Cir. 2003) ("Courts may apply the abuse of trust enhancement even if the defendant did not occupy a position of trust in relation to the victim of the offense of conviction . . . ."). Accordingly, the government need not prove actual harm to the interests of those whose trust has been abused in order for § 3B1.3 to apply; in some cases, the harm may be visited upon someone outside the trust relationship. *Cf. United States v. Fife*, 471 F.3d 750, 753 (7th Cir. 2006) (although federal government was direct victim of a city official's tax fraud, official abused city's trust by committing the crime); *Cruz*, 317 F.3d at 766-67 (affirming application of the enhancement where defendant used her position as office man-

ager of a small company to defraud the company's banks.). In other cases, the harm from the abuse of trust may be intangible. That is certainly the case here. But there is nothing in § 3B1.3 that requires the government to prove that the defendant's conduct "victimized" those whose trust he abused in the commission of the crime.

Accordingly, the government was not required to produce a Democratic Party official to specifically disavow Powell's flagrantly illegal mode of increasing Democratic voter turnout in East St. Louis. The district court misinterpreted § 3B1.3 in holding to the contrary. Powell used his position as chairman of the East St. Louis Democratic precinct committee to direct a vote-buying conspiracy in connection with the November 2004 election. That is an abuse of a position of trust within the meaning of § 3B1.3; the two-level enhancement should have been applied.

Accordingly, we VACATE Powell's sentence and REMAND for resentencing with application of the §3B1.3 enhancement. In all other respects, the defendants' convictions and sentences are AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*