In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 07-1561

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GUSTAVO CAMPOS,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 156—**John W. Darrah**, *Judge.*

_____

ARGUED FEBRUARY 14, 2008—DECIDED SEPTEMBER 3, 2008

_____

Before RIPPLE, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Gustavo Campos was charged with nine other defendants in a multi-count indictment with a drug conspiracy and other drug-related crimes. A jury convicted him as charged, and the district judge sentenced him to a term of life imprisonment. Campos contends on appeal that there was a fatal variance between the conspiracy charged in the indictment and the government's proof at trial. He also contends that the

district court erred in declining to give his proposed multiple conspiracies jury instruction and in denying his motion to suppress wiretap evidence. He challenges the reasonableness of his sentence as well. We affirm.

## I. Background

This case involves the large-scale drug-trafficking of hundreds of kilograms of cocaine and thousands of pounds of marijuana from Texas to Chicago from 2001 into the early part of 2004. The trafficking had three phases, but it involved a constant and common goal—the transportation of large quantities of cocaine and marijuana from Texas to Chicago for re-sale there. Another constant factor in this situation was the guiding hand of Gustavo Campos at the center of every aspect of the trafficking, from top to bottom. In the first phase of operation, from the summer of 2001 to March 2002, several trips were made to transport large quantities of cocaine and marijuana from Texas to Chicago using semi-trailers which were towed by semi-tractors. The drugs were hidden in false compartments located in the semi-trailers. In March 2002, Drug Enforcement Agency ("DEA") agents seized one of these semi-trailers while en route from Texas to Chicago with 250 kilograms of cocaine. After this seizure, a second phase began, lasting from about April 2002 to June 2003, in which passenger vehicles including rental cars were used to transport drugs and money. This phase ended in June 2003, when the DEA seized a rental car after it had been loaded with cash for a trip from Chicago to Texas; the ensuing search led to the discovery of over $135,000

in hidden cash. At that point, a third, but familiar, phase of operation began in which the use of semi-tractors/ trailers resumed as the mode of drug transportation. This third and final phase spanned from July 2003 to February 2004. On February 10, 2004, DEA agents seized approximately 325 kilograms of cocaine from a Chicago warehouse, bringing the operating aspects of this trafficking to a close, and shifting the governmental scrutiny of it from investigation to prosecution.

The evidence at trial demonstrated that the three phases of trafficking described above constituted a conspiracy. Campos led the conspiracy, running all aspects—financing, recruiting, and operations—from Chicago. Felix Herrera was the head of the conspiracy's Texas operations. He coordinated the loading of drugs into semi-trailers and passenger vehicles. Martin Vasquez supervised the semi-tractor/trailer transportation and, in many cases, drove the passenger cars between Chicago and Texas. Campos, Herrera, and Vasquez participated in the conspiracy throughout all three phases.

In 2001 Campos was looking for drivers to transport drugs from Texas to Chicago. So he asked Vasquez, a former trailer salesman, if he knew of a truck driver eligible to drive in all 48 contiguous states. Vasquez introduced Campos to Jerry Maj, the owner of Jerry's Advanced Trucking located in Summit, Illinois. Campos and Vasquez met with Maj, and Campos offered Maj $25,000 to drive a semi-tractor/trailer round trip from Chicago to Texas, returning with drugs, specifically marijuana. Maj accepted the offer. At about the same time,

Jacek (or Jack) Zelek was working as a commercial truck driver for Maj. Zelek's semi-tractor needed repairs, so he asked Maj for a loan of $20,000. Maj agreed to loan Zelek the money, if Zelek would transport drugs from Texas to Chicago. Zelek agreed.

In or around August 2001, Campos arranged to have the inside of the semi-trailer outfitted with a false front wall for purposes of concealing large quantities of drugs and cash for transportation between Texas and Chicago. Campos offered Vasquez $5,000 to travel to Texas with Zelek, meet with Campos's Texas contacts, including Herrera, and deliver money to be hidden in the trailer. Vasquez accepted. As a result, once the customization of the semi-trailer was finished, Campos conducted a final inspection and placed $1,475,000 in cash behind the false wall. The next day Zelek and Vasquez made the trip from Chicago to Texas. Upon their arrival, Vasquez called Campos who said that he and Zelek would be met by a group of men whom they should follow to another location. A short while later, Vasquez and Zelek were approached by some men, just as Campos had indicated. Vasquez and Zelek followed the group to a residential area where they parked the semi-tractor/trailer. Zelek remained in the semi-tractor while Vasquez removed the false front wall from the semi-trailer and the cash was removed. Campos repeatedly called Vasquez to check on the status of the operation. Once their mission was accomplished, Vasquez and Zelek returned to Chicago.

Zelek made six more round trips between Chicago and McAllen or Roma, Texas, for the conspiracy from

August to December 2001. On all but two, he returned with a semi-tractor/trailer carrying drugs. Zelek was directed to leave the semi-tractor/trailer at a particular location, wait while the drugs and, typically vegetables, which were used to hide the drugs, were loaded onto the trailer, and then drive the semi-tractor/trailer back to Chicago. Campos paid Maj $25,000 for Zelek's first trip. But after that, Maj demanded more money, so Campos agreed to pay him $50,000 for each trip Zelek made for the organization.

On December 4, 2001, DEA agents stopped Zelek's semi-tractor/trailer in Texas to conduct a routine inspection. They discovered 1,754 pounds of marijuana hidden in the semi-trailer and placed Zelek under arrest. Shortly after Zelek's arrest, Campos began searching for a replacement driver. His brother, Maximino Campos, recommended a commercial truck driver, Rogelio (or Roger) Perez.[1]

On December 19, 2001, Maximino, acting at Campos's direction, offered to pay Perez to make round trips between Chicago and Texas. Perez was interested, so he was told to meet with Campos the next day. Perez met with Campos who told Perez that if he were a loyal member of the conspiracy, he would make a lot of money. At the end of the meeting, Campos offered Perez a position with the conspiracy, which Perez accepted. Campos told Perez that he would be in charge of transporting

---

[1] To avoid confusion between the two brothers, we refer to Maximino by his first name.

empty semi-trailers from Chicago to Texas and returning them to Chicago loaded with drugs. After the meeting with Campos, Perez met with Vasquez.

A while later, Perez picked up an empty semi-trailer to haul to Roma, Texas. Vasquez gave Perez detailed driving directions from Chicago to Texas and a phone number with which to contact him when Perez reached Texas. Perez drove the semi-trailer to Texas. When he arrived, he was unable to reach Vasquez, so he called Maximino who told him that Herrera would meet him. Perez met with Herrera, dropped off the empty semi-trailer, and then returned to Chicago.

In early February 2002, Campos met with Perez to ask him to make another round trip from Chicago to Texas. Unlike the first trip, this trip would involve transporting drugs hidden in a semi-trailer from Texas to Chicago. Campos offered to buy Perez a semi-tractor so he could make multiple round trips to and from Texas. Campos told Perez that he had a five-year contract which required him to transport six tons of cocaine from Texas to Chicago. Campos did not follow-up on his offer to buy Perez a semi-tractor, so Perez attempted to borrow one from a friend. But the friend was aware of the nature of the trip and refused to lend his semi-tractor. Campos told Perez to offer the friend more money ($40,000), but the friend still refused. A few days later, Campos summoned Perez to a meeting at which he expressed frustration with Perez's inability to obtain a semi-tractor. Campos told Perez that people in Texas were waiting for him. Perez responded that he would make one more attempt to

obtain a semi-tractor. He contacted law enforcement instead.

In late February 2002, Perez, by then working with the DEA, told Campos that he found a semi-tractor and that his friend Willie Chester, a/k/a "Rock," was willing to make the round trip between Chicago and Texas, bringing back drugs. Campos met with Rock to confirm that he could obtain the semi-tractor and make the trip. Satisfied with Rock, Campos paid him $9,000 in cash. Unbeknownst to Campos, however, Rock, like Perez, had begun working with the DEA. Rock made the round trip between Chicago and Texas. During the trip he stayed in constant contact with Perez who stayed in constant contact with Campos.

On March 1, 2002, Rock, escorted by the DEA, returned to Chicago with the semi-tractor/trailer loaded with 250 kilograms of cocaine. The DEA seized the semi-trailer, searched it, and discovered the cocaine. When Campos learned of the this, he called Perez to a meeting at Maximino's house. When Perez arrived, he was taken by Campos and another person down to the basement. The other man pulled out a gun and pointed it at Perez while Campos demanded to know what happened to the semi-trailer and where Rock lived. Campos threatened Perez that he would be killed if the semi-trailer was not found. Perez claimed he had nothing to do with the loss of the semi-trailer and agreed to search for it with Campos.

After the March 1 seizure, the use of semi-tractors/trailers was stopped in favor of using passenger vehicles with hidden compartments, thus entering the second

phase of the conspiracy. Like the semi-trailers, the passenger vehicles were loaded with cash in Chicago and with drugs in Texas. Campos met with Vasquez to discuss this new method of transportation. Beginning in June 2002, Vasquez made round trips between Chicago and Texas in passenger vehicles. He made a total of seven round trips, using a rental car for all but one. Campos indicated that the cars should be rented for one week in order to provide enough time to get the drugs from Texas to Chicago. He instructed Vasquez to rent a Lincoln Town Car or Mercury Grand Marquis because they had large frames in which to easily conceal money and drugs. When Vasquez used a rental car, Campos arranged for the dates for the rental and for someone to transport Vasquez to pick up the rental car at the airport. Shortly after Vasquez drove a rental car from the lot, he was met by a person identified by Campos to whom Vasquez turned over the car. The car was taken away and loaded with cash, hidden behind the dashboard. After that, which usually took one or two days, Campos notified Vasquez that the rental car was ready and where he could pick it up. Vasquez picked up the car and drove it, with the cash, to Texas.

Once Vasquez reached Texas, he called Campos, who in turn contacted Herrera. Then the rental car was picked up, the money removed, and the drugs were hidden inside. This process typically lasted several days. When it was completed, the car was returned to Vasquez who drove it, along with the drugs, back to Chicago. On the way, Vasquez was in telephone contact with Campos who wanted to ensure that Vasquez was not appre-

hended at any checkpoint en route to Chicago. When Vasquez arrived in Chicago, he contacted Campos who had someone pick up the rental car so the drugs could be removed. After this process was complete, the rental car was returned to Vasquez who returned it to the airport car rental. Campos paid Vasquez $5,000 per trip.

On June 10, 2003, Campos arranged to have a car rented by Vasquez parked at a predetermined location. As with prior trips, Vasquez went to the location as instructed by Campos to pick up the car but was unable to find it. He called Campos and reported that he could not find the car. Campos contacted the persons who had parked the car to confirm the exact location. He did not know that the DEA had seized the car, which contained approximately $135,000 in cash, pursuant to a warrant. This seizure led to the end of the organization's use of passenger cars to transport drugs and money—the end of the second phase of the conspiracy.

Campos decided to return to the use of semi-tractors/ trailers to transport drugs from Texas to Chicago; thus began the third phase of the conspiracy. Campos searched for a driver, a semi-tractor/trailer, and a warehouse in which to unload the drugs in Chicago. With Vasquez's help, Campos made contact with Joseph Bleka, the lessor of a warehouse on 4800 S. Central Avenue, Chicago, Illinois. Vasquez knew Bleka from his involvement in a drug delivery Perez had made for the organization in 2002. Vasquez asked Bleka if they could use his warehouse again. Bleka agreed.

So, beginning in July 2003, the conspirators again transported drugs from Texas to Chicago using semi-trac-

tors/trailers, unloading the drugs at Bleka's warehouse. Campos hired the individuals who transported the drugs from Texas to Chicago. He coordinated the loading of the drugs in Texas with Herrera and the arrival of the drugs in Chicago with Vasquez. Campos paid Bleka $5,000 for each shipment of drugs that was unloaded in his warehouse. On February 10, 2004, the DEA searched Bleka's warehouse, seizing 325 kilograms of cocaine and 3.7 kilograms of marijuana. Campos was arrested that night, and the operations of the drug organization ceased.

A superseding indictment charged that from in or about the summer of 2001 until on or about February 10, 2004, Gustavo Campos, Maximino Campos, Felix Herrera, Martin Vasquez, Joseph Bleka, and others agreed and conspired "knowingly and intentionally to possess with intent to distribute and to distribute controlled sub-stances, namely, in excess of five kilograms of mixtures containing cocaine, and in excess of 100 kilograms of marijuana[.]" The indictment alleged that as part of the conspiracy Gustavo Campos was the leader of a large-scale drug distribution network based in Chicago which was responsible for transporting cocaine and marijuana from Texas to Chicago for redistribution. It was alleged that the drugs were transported "in a variety of ways, including by concealing the narcotics in over-the-road semi-trailers and in passenger vehicles." Gustavo Campos was alleged to have had overall responsibility for the conspiracy. A jury found Campos guilty as charged. He was sentenced to a term of life imprisonment. Campos appealed.

## II. Discussion

Campos makes four arguments on appeal. He argues first that there was a fatal conspiracy variance because the government proved three distinct conspiracies at trial instead of the single conspiracy alleged in the indictment. He argues that the district court erred in declining to give his proposed multiple conspiracies instruction. The court also erred, he says, in denying his motion to suppress the wiretap evidence because the government failed to establish necessity for the wiretap. Lastly, he challenges the reasonableness of the sentence imposed, arguing the district court failed to properly consider the factors in 18 U.S.C. § 3553 and erroneously dismissed the mitigating factor of his pretrial conditions of confinement. We address each of these arguments in turn.

### A. Conspiracy Variance

Campos contends that there was a fatal variance between the single conspiracy charged in the indictment and the government's proof of three separate conspiracies at trial. A conspiracy variance claim is treated as a challenge to the sufficiency of the evidence, which is reviewed under a highly deferential standard. *United States v. Thomas*, 510 F.3d 714, 722 (7th Cir. 2007). We view the evidence in the light most favorable to the government and draw all reasonable inferences from the evidence in the government's favor. *Id.*

To overturn a conspiracy conviction based on a variance, a defendant must show a variance between the charge in the indictment and the evidence at trial and that he

was prejudiced by the variance. *United States v. Womack*, 496 F.3d 791, 794 (7th Cir. 2007). The question of whether there is a single conspiracy is for the jury. *Id.* " 'Even if the evidence arguably established multiple conspiracies, there is no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment.' " *Thomas*, 510 F.3d at 722 (quoting *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991)).

Campos argues that the government introduced evidence at trial of three distinct conspiracies involving three different modes of operation, co-conspirators, objectives, and big bosses: (1) an agreement with Vasquez, Maj, Zelek, certain "paisas"[2] in Mexico, and others to bring large amounts (250 to 350 kilograms) of cocaine to Chicago for trans-shipment in the summer and fall of 2001; (2) an agreement with Vasquez, other unknown co-conspirators, and different paisas in Mexico to bring small amounts (5 to 8 kilograms) of cocaine to Chicago for local shipment in the fall and winter of 2002; and (3) an agreement with Vasquez, Bleka, and various others to bring large amounts (hundreds of kilograms) of cocaine to Chicago for trans-shipment in the fall and winter of 2003-2004. However, a reasonable jury could have found the existence of the single, overall conspiracy to distribute substantial

---

[2] Rogelio Perez testified that the Spanish term "paisas" referred to fellow Mexicans, and that when Campos used the term, it was understood to mean Mexicans involved in the drug trade.

amounts of cocaine and marijuana as charged in the indictment.

Campos concedes that he and Vasquez were involved in substantial drug activity, but he contends that there were three similar but distinct and separate conspiracies, even though each involved the transportation of drugs to Chicago. However, the evidence supports a reasonable inference that each of what Campos alleges to be distinct conspiracies shared a common objective or purpose, "the defining characteristic of a conspiracy." *United States v. Thomas*, 520 F.3d 729, 733 (7th Cir. 2008). That common objective was to transport cocaine and marijuana from Texas to Chicago for redistribution. In particular, the evidence established that in February 2002 Campos told Perez that he had a five-year contract requiring him to transport six tons of cocaine from Texas to Chicago. The fact that the means of transporting the drugs to Chicago changed from one phase to another and back again does not necessarily render each phase a distinct conspiracy. *See United States v. Bullis*, 77 F.3d 1553, 1560 (7th Cir. 1996) (explaining that the fact that the conspirators generally changed the pricing levels each year of the conspiracy did not make each year a separate conspiracy); *United States v. Lynch*, 699 F.2d 839, 843 (7th Cir. 1983) ("The mere fact . . . that the methods used to perpetrate the scheme changed slightly does not indicate that one conspiracy has ended and that another has begun . . . ."). Nor does the fact that the three phases of the conspiracy involved different participants (other than Campos, Vasquez and Herrera), turn the single conspiracy into separate conspiracies. *See Bullis*, 77 F.3d at 1560

("[T]urnover in the members of a conspiracy does not transform a single conspiracy into multiple conspiracies so long as there is a continuation of the original conspiracy's purpose."). While some participants in the conspiracy changed, the core participants—Campos, Vasquez, and Herrera—remained the same. The evidence allowed the jury to find that Campos not only participated in each of three phases of a single conspiracy, but also that he was the leader of each stage and directed his co-conspirators in each. Furthermore, the temporal separation between each of the phases was minimal and limited to that necessary to allow the conspirators to regroup and change their methods used to carry out the conspiracy in order to evade detection.

The defendant likens his situation to that in *United States v. Johnson*, 515 F.2d 730 (7th Cir. 1975), where we held that the variance between the indictment and proof at trial required reversal of the conspiracy conviction. But the facts in *Johnson* were quite different than those here. Johnson and six others were charged with a conspiracy to dispose of stolen motor vehicles in interstate commerce. Johnson participated in the purchase of three stolen vehicles. *Id.* at 731. Most of the evidence at trial, however, related to the activities of Johnson's co-defendants, including Joseph Altvare, who attempted to dispose of six other vehicles through a used car lot. There was no evidence that Johnson had any connection to those vehicles, the car lot, or any of the other people involved, except Altvare. *Id.* at 733. We found that the evidence linked Johnson to only Altvare and held that it was insufficient to establish that Johnson participated

in the overall conspiracy charged in the indictment. *Id.* at 731-33. In contrast, Campos admits that he participated in each of the three alleged separate conspiracies. He conceded "knowing all the players," "knowing all the parts," and "participating in everything[.]"

Campos also sees similarities between his case and *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969), in which we held the evidence was insufficient to establish a single overall conspiracy. *Id.* at 742-43. In *Varelli*, the defendants were charged with a conspiracy to hijack, carry away, and distribute interstate shipments of merchandise. *Id.* at 741. The evidence at trial proved that some participants were involved in hijacking silver shipments and Polaroid equipment, but others were involved only in the silver hijackings and had no discussions about other hijackings. *Id.* at 743-44. The fact that the two conspiracies had some common participants was insufficient to establish one overall conspiracy. *Id.* at 744. We explained: "The conspirators in the Polaroid hijacking did not contemplate a series of hijackings in which all would partake. Rather, the Polaroid hijacking represented a single transaction with a single purpose." *Id.* In contrast, here, the evidence was sufficient for the jury to find that Campos was involved in each of the three allegedly separate conspiracies that shared one common objective. Furthermore, the variance in *Varelli* proved fatal because the jury was not instructed that they could find multiple conspiracies and still find the defendants guilty. *Id.* at 747. Here, though, the jury was instructed that they could find multiple conspiracies and still find Campos

guilty—provided the proven conspiracies were within the charged conspiracy.

We conclude that the evidence at trial was sufficient to prove beyond a reasonable doubt that Campos participated in the single, overarching conspiracy charged in the indictment. And no variance existed between the conspiracy charged and the proof at trial: The indictment alleged a conspiracy to transport substantial amounts of cocaine and marijuana from Texas to Chicago for redistribution; the evidence at trial was consistent with these allegations.[3]

### B. Multiple Conspiracies Instruction

Campos argues that the district court erred in refusing to give his proposed multiple conspiracies jury instruction. A decision regarding a jury instruction is reviewed for an abuse of discretion. *United States v. Van Sach*, 458 F.3d 694, 702 (7th Cir. 2006). A defendant is entitled to an instruction on his theory of defense only if "(1) the instruction provides a correct statement of the law; (2) the theory of defense is supported by the evidence; (3) the theory of the defense is not part of the government's charge; and (4) the failure to include the instruction would deprive the defendant of a fair trial." *United States v. Millet*, 510 F.3d 668, 675 (7th Cir. 2007). Whether an

---

[3] We thus do not reach the argument that the convictions on the substantive counts should be reversed because the jury was given a *Pinkerton* instruction.

instruction correctly states the law is reviewed de novo. *Van Sach*, 458 F.3d at 702.

Campos's proposed multiple conspiracies instruction read:

> Count One of the indictment charges that defendant Gustavo Campos knowingly and deliberately entered into a conspiracy to possess with intent to distribute and to distribute cocaine.
>
> In order to sustain its burden of proof for this charge, the government must show that the single master conspiracy alleged in Count One of the indictment existed. Proof of separate or independent conspiracies is not sufficient.
>
> In determining whether or not any single conspiracy has been shown by the evidence in the case you must decide whether common, master, or overall goals or objectives existed which served as the focal point for the efforts and actions of any members to the agreement. In arriving at this decision you may consider the length of time the alleged conspiracy existed, the mutual dependence or assistance between various persons alleged to have been its members, and the complexity of the goal(s) or objective(s) shown.
>
> Even if the evidence in the case shows that Defendant Campos was a member of some conspiracy, but that this conspiracy is not the single conspiracy charged in the indictment, you must acquit Defendant Campos of this charge.

Unless the government proves the existence of the single master conspiracy described in the indictment beyond a reasonable doubt, you must acquit defendant Campos of this charge.

The district court said that under *United States v. Wilson*, 134 F.3d 855 (7th Cir. 1998), this instruction was erroneous.

The experienced district judge is correct. The proposed instruction required the jury to acquit if it found that Campos was a member of some conspiracy, but not a conspiracy charged in the indictment. In *Wilson*, we held that it was error to instruct the jury that if the government fails to prove the exact conspiracy charged in the indictment, the jury should acquit. *Id.* at 864-65. And we added that such an instruction "is always inappropriate as a matter of law." *Id.* at 865. This is because the "prosecutor may elect to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged, so long as the subset is also illegal." *Id.* (internal citation omitted).

The district court gave the following multiple conspiracies instruction:

If you find there was one overall conspiracy as alleged in Count 1 and that a particular defendant was a member of that conspiracy, you should find that defendant guilty of Count 1.

If you find there were two or more conspiracies and that a particular defendant was a member of one or more of these conspiracies, you may find that defendant guilty of Count 1 only if you further

find that this proven conspiracy was included within the conspiracy alleged in Count 1. If, on the other hand, the proven conspiracy is not included within the conspiracy alleged in Count 1, you should find that defendant not guilty of Count 1.

We approved of a nearly identical instruction in *Wilson*. That instruction informed the jury that if it found the defendant was a member of a conspiracy that was a sub-part of the charged conspiracy, then it should find the defendant guilty. *Id*. Here, as in *Wilson*, the jury's guilty verdict "concluded that [Campos was a] member[] of a conspiracy and that, at a minimum, this conspiracy was part of the single conspiracy alleged by the Government." *Id.*

Campos contends that *Wilson* is limited to defendants who played a finite role in a larger conspiracy which included parts and players unfamiliar to the defendants. He points to no authority to support this reading, and we are unaware of any. Furthermore, *United States v. Mansoori*, 304 F.3d 635 (7th Cir. 2002), suggests that his view is incorrect. One of the defendants in *Mansoori*, Terry Young, was a leader and high-ranking member of a gang engaged in drug trafficking. In fact, he was in charge of the gang's drug sales. *Id.* at 642-43. As such, Young would have played a substantial, broad role in the drug con-spiracy—a role similar to Campos's role here. In address-ing the *Mansoori* defendants' challenge to the multiple conspiracies instruction, we cited *Wilson* with approval.

At oral argument Campos also argued for the first time that the multiple conspiracies instruction was improper

because it did not require the jury to unanimously find that he participated in any particular subset of the charged conspiracy, if the jury were to find that he participated in a subset conspiracy rather than the charged conspiracy. He did not propose a unanimity instruction at trial and waited until his appellate oral argument to raise the issue. Therefore, this argument is waived. *United States v. Vallery*, 437 F.3d 626, 629 (7th Cir. 2006) (finding that argument raised for first time at oral argument is waived).

Even if not waived, Campos would not prevail on this argument. In *Mansoori*, we rejected this type of argument. We stated: "Even if the jurors were of different minds as to the precise parameters of the conspiracy, the instruction required them all to agree that the defendant joined a conspiracy that was within the ambit of the conspiracy alleged in the indictment." *Mansoori*, 304 F.3d at 657. We held that the instruction properly required unanimity with respect to the essential elements of a conspiracy. But even if the instruction had been defective, we concluded that giving it was harmless error because the evidence overwhelmingly proved that the defendants participated in a unitary conspiracy. *Id.* So, too, here. Even if the multiple conspiracies instruction had been improper, the evidence that Campos participated in the single overall conspiracy as charged was so overwhelming that any error in giving the instruction was harmless.

Campos suggests that the district judge's refusal to give his proposed instruction was based on the erroneous conclusion that it was sufficient if the alleged multiple

conspiracies occurred within the same time frame as that of the charged conspiracy. That is not what the judge said, though. He stated, "so long as there was one overall conspiracy alleged . . . so long as these included, so-called included conspiracies occurred within that time *and* as generally charged in the indictment, there is no right to give the instruction proposed by Campos." (Trial Tr. 1730) (emphasis added). Thus, we understand the district judge to have required not only temporal proximity, but also that the included conspiracies were "as generally charged," that is, subparts of the charged conspiracy. The jury instruction given corroborates this understanding of the district court's ruling. Accordingly, the district judge did not abuse its discretion in refusing to give Campos's proposed multiple conspiracies instruction.

### C. Wiretap Evidence

Campos contends that the wiretap applications failed to meet the standard of necessity, and thus the district court should have suppressed the evidence obtained from the wiretaps. 18 U.S.C. § 2518(1)(c) requires that each application for an interception of a wire, oral, or electronic communication include: "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" This has become known as the exhaustion or necessity requirement. *United States v. Fudge*, 325 F.3d 910, 919 (7th Cir. 2003); *United States v. Thompson*, 944 F.2d

1331, 1340 (7th Cir. 1991). However, this provision should not be understood as requiring absolute necessity. *Thompson*, 944 F.3d at 1340. It does not require "that any other investigative procedure be tried first before an order is issued for the interception of wire communications," *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir. 1976); *see also Thompson*, 944 F.2d at 1340, or that a wiretap be used as a last resort, *United States v. McLee*, 436 F.3d 751, 762-63 (7th Cir. 2006); *Thompson*, 944 F.2d at 1340. This provision requires only that the success of other methods of investigation appears unlikely or too dangerous. *Thompson*, 944 F.2d at 1339-40; *Anderson*, 542 F.2d at 431. The government's burden of proving necessity "is not great" and its compliance with the necessity requirement is " 'reviewed in a practical and common-sense fashion.' " *McLee*, 436 F.3d at 763 (quoting *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995)). We review a district court's finding of necessity for an abuse of discretion. *United States v. Dumes*, 313 F.3d 372, 378 (7th Cir. 2002).

Each of the five affidavits supporting the applications in this case explained that normal investigative techniques had been tried with limited or no success or appeared reasonably unlikely to succeed if attempted in the investigation. The affidavits stated that the agent (Officer Todd Arthur) believed, based on his experience and training, that subpoenaing members of the Campos organization to testify before a grand jury would be of no value because it was very likely that they would flee the jurisdiction instead of testifying, but if they were to appear to testify, they would invoke their Fifth Amend-

ment rights. The affidavits also said that grand jury subpoenas might permanently hinder efforts to obtain statements from members of the Campos organization. These facts support the finding of necessity. *See United State v. Gray*, 410 F.3d 338, 343 (7th Cir. 2005) (finding an affidavit that stated dealers were likely to invoke Fifth Amendment if subpoenaed to testify before grand jury satisfied the necessity requirement). The affidavits further stated that based on the agent's experience, interviews of the subjects or their associates would not be useful in producing sufficient information about the conspirators and conspiracy, responses to interviews would include a significant amount of false information, and interviews would alert other members of the conspiracy, compromising the investigation. These facts also support the finding of necessity. *See United States v. Adams*, 125 F.3d 586, 595-96 (7th Cir. 1997) (finding an application which stated that questioning individuals would alert them and possibly others higher up in the organization to the fact of the investigation met necessity requirement). The affidavits indicated that law enforcement had not identified specific locations where the Campos organization stored cocaine, drug proceeds, or other indicia of drug trafficking, so the use of search warrants was not a feasible at the time. Again, these facts show necessity. *Dumes*, 313 F.3d at 379 (finding necessity shown because, *inter alia*, agents were unsuccessful in gathering enough evidence of drug storage locations).

As for surveillance and related interception, the affidavits stated that physical surveillance had been attempted numerous times and had proven useful, but had not

resulted in sufficient evidence of the criminal activity being investigated. In addition, continued surveillance was likely to alert the suspects of the investigation, causing them to become more cautious in their criminal activities, flee to avoid further investigation and prosecution, and otherwise compromise the investigation. These facts support a finding of necessity. *See id.* (finding necessity where additional physical surveillance was believed to increase the risk that the targets would be alerted to the investigation); *United States v. Ceballos*, 302 F.3d 679, 683-84 (7th Cir. 2002) (finding fact that physical surveillance would likely alert the subjects to the investigation showed necessity); *Adams*, 125 F.3d at 595-96 (concluding necessity shown where other surveillance techniques were considered too dangerous and could result in detection of the investigation).

The affidavits further stated that no undercover agent had been used to try to infiltrate the conspiracy because of the close and secretive nature of the organization and that use of an undercover agent was perceived as too dangerous. These facts also support a finding of necessity. See *Gray*, 410 F.3d at 343 (finding necessity based in part on fact that an undercover agent would be unlikely to infiltrate the organization because of its insular nature); *United States v. Zambrana*, 841 F.2d 1320, 1331-32 (7th Cir. 1988) (finding necessity based on evidence that informants and undercover agents could not infiltrate the closely run family organization).

The affidavits also indicated that the government used two confidential sources who had provided useful infor-

mation about the conspiracy. But one source was on the fringe of the organization and had no direct contact with the mid- or high-level members of the organization, and the other was no longer cooperating, so he could provide no more than historical information. The affidavits identified one cooperating witness by name, but he was no longer actively cooperating and had been incarcerated for a while, so he appeared unable to provide information to fully identify current members of the organization, their roles, the sources of supply, and like details. This makes this case like *Gray*, 410 F.3d at 343, where necessity was based in part on the fact that confidential informant #1 could not provide current information because of his incarceration and confidential informant #2 could not identify the source, couriers, or customers. Pen registers, toll and trace records of a phone utilized by one conspirator were also used, but these had their limitations as well.

Finally, the four subsequent applications for wiretaps demonstrate the continuing need for the wiretaps. For example, the May 22, 2003, affidavit indicated that a wiretap on target phone 2 was needed because Campos was using that phone to contact at least one other member of the organization with whom Vasquez was not in contact with over target phone 1. The June 5, 2003, affidavit stated that Vasquez was using target phone 1 to contact at least one other member of the organization with whom Campos was not in contact over target phone 2. Later affidavits stated that these uses were continuing. Thus, the wiretap on target phone 2 and continued authorizations for wiretaps on target phones 1

and 2 were needed to obtain evidence as to the full scope of the drug trafficking and related activities.

Campos argues that where normal investigative techniques are working and working well, a wiretap is not necessary. In *Zambrana*, 841 F.2d at 1331-32 though, we noted that normal investigative techniques had been successful to some extent, but nonetheless found a wiretap necessary because it did not appear that normal techniques were likely to identify all co-conspirators at all levels of the drug conspiracy. Campos also argues that at some point after months of wiretapping, the need for a wiretap ends. But he cites no authority placing a time limit on necessity, and we are unaware of any. True enough, wiretaps should not be allowed to run indefinitely. But whether the need for a wiretap has played out should be evaluated on an investigation-by-investigation basis, and there is no indication that the use of wiretaps here exceeded what was reasonably necessary to identify and disassemble a major drug organization.

Campos further argues that the government had all the evidence it needed to prosecute this case such that the wiretaps served no purpose. But using a wiretap to obtain additional incriminating evidence against a defendant is not problematic. *See Fudge*, 325 F.3d at 919 (rejecting argument that wiretap was unnecessary because there was enough evidence to prosecute each conspirator); *Adams*, 125 F.3d at 596 (rejecting claim that even if first wiretap was necessary, the second was not because the government had obtained sufficient information from the first). Even if the government had enough evidence

to indict Campos prior to obtaining the wiretaps, this fact would not preclude a finding of necessity. *See McLee*, 436 F.3d at 763. After all, the government's burden of proof at trial is substantially higher than its burden in obtaining an indictment. And the government was entitled to attempt to identify the full extent of this organization and its operatives.

Campos submits that generalizations and boilerplate language do not satisfy the necessity requirement. Other circuits have indicated that the government may not make the required showing of necessity with "mere boilerplate recitation of the difficulties of gathering usable evidence" but must "base its need on real facts" specific to "the case at hand." *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995). These circuits, however, have upheld wiretap authorizations based on applications that contain statements about both general investigative experience in the type of crime involved and the particular facts of the case at hand. *United States v. Vento*, 533 F.2d 838, 850 n.19 (3d Cir. 1976); *United States v. DiMuro*, 540 F.2d 503, 510-11 (1st Cir. 1976). That is what we have here. We caution the government, though, that the repeated use of boilerplate from one application to the next is discouraged. But at least here we do have additional new information in each successive affidavit, which was sufficient to justify the issuance of each of the wiretap authorizations.

Nonetheless, the government's affidavits supporting its applications for the wiretaps established that the wiretaps were not the first investigative method used, which is "[t]he evil we are trying to avoid[.]" *Fudge*, 325

F.3d at 919; *Thompson*, 944 F.3d at 1340. The affidavits showed the necessity for the wiretaps and thus satisfied § 2518(1)(c). This ruling does not lead to the conclusion that ordinary investigative procedures always will be insufficient to investigate a drug conspiracy. The district courts, and we, will look at each case individually, considering the practicalities of each investigation and using our good reason and common sense. Accordingly, we hold that the district court did not abuse its discretion in granting the applications for the wiretaps and in admitting the evidence obtained through the wiretaps.

Before leaving this issue, we must comment on the statement in Campos's opening brief that the Chief Judge and the district judge, in approving the wiretap applications, merely "co-signed" the government's laziness. This is a serious allegation that is unsupported by any factual basis. The affidavits and the record at trial demonstrate that government agents undertook arduous efforts to investigate this drug operation. It is also clear that the affidavits received the rigorous and independent review that is required by law. The judges were simply exercising their discretion in determining whether the government had shown necessity for the wiretaps. We find no abuse of discretion here, and Campos's disagreement with that view does not justify such a pejorative and undeserved remark.

### D. Sentencing Issues

The defendant also argues that his sentence is both procedurally and substantively unreasonable. Specifically,

he contends that the district court did not consider the sentencing factors in § 3553(a) or the mitigating factor of his pre-trial conditions of confinement.[4] We review whether a district court followed post-*Booker* sentencing procedures under a non-deferential standard of review. *United States v. Price*, 516 F.3d 597, 606 (7th Cir. 2008).

Under the *post-Booker* sentencing procedures, a district court is to: "(1) calculate the applicable Guidelines range; (2) give the defendant an opportunity to identify any of the 18 U.S.C. § 3553(a) factors that might warrant a non-Guidelines sentence; and (3) state which factors influenced the final sentence." *United States v. Millet*, 510 F.3d 668, 680 (7th Cir. 2007). The court need not make factual findings as to each of the sentencing factors; it is sufficient that the record shows that the court considered them. *Price*, 516 F.3d at 606. This procedure was properly followed here.[5]

The district court considered the presentence investigation report and the government's sentencing memorandum as well as the defendant's objections and corrections to that report. And the court heard the parties' arguments at the sentencing hearing. The defendant had an opportunity to argue the § 3553(a) factors and other circumstances that he believed justified a lower sentence, and he did so.

---

[4] Campos refers to "various mitigating factors" in his brief but identifies only one: the conditions of his pretrial confinement; we accordingly limit our discussion to that factor.

[5] Campos does not contend that the district court erred in calculating the applicable guidelines range—a life sentence.

The court's comments at sentencing reflect proper consideration of the § 3553(a) factors and other circumstances urged by the defendant; however, the court did not conclude that they justified a below guidelines sentence.

In sentencing Campos, the district court first considered the nature and seriousness of the offense and the defendant's conduct: "Gus Campos stands before the court convicted as the leader of a narcotics conspiracy which was responsible for the distribution of in excess of 1,000 kilograms of cocaine, probably greatly in excess of that." The court found it "hard to . . . envision an offense more egregious, [and] that has broader ramifications" than that committed by Campos over several years. The court also considered the mitigating factor that Campos had no prior criminal history. As for aggravating circumstances, the court found that Campos's conduct was motivated by nothing other than "personal greed and by money" at the price of ruining others' lives. The court referred to the "chilling" tapes of conversations between Campos and others and the "no holds barred" nature in which he approached the cocaine distribution business.[6] The court also considered the fact that Campos was bright, having graduated 13th of 261 students in his high school class, and could have made a real contribution to society but chose not to do so. The court then determined that a sentence within the guideline range was

[6] In a conversation with Herrera on June 3, 2003, for example, Campos complains that business has been "dead" and "[p]eople are not getting addicted."

necessary to comply with the purposes of § 3553(a)(2). The court found that deterrence was especially important in this case "because the rewards, the money is obviously so lucrative . . . that it would induce people such as yourself to take the risk of this kind of incarceration simply for financial reward." Based on its meaningful consideration of these factors, the court determined that a sentence within the guideline range was "clearly" and "eminently" reasonable. We conclude, as the district judge's comments at the sentencing hearing demonstrate, that the judge properly considered the § 3553(a) factors and adequately explained how they affected his determination of the sentence.

Campos also argues that the sentence itself was unreasonable. We review a sentence for reasonableness in light of the factors in § 3553(a). *United States v. Tahzib*, 513 F.3d 692, 694 (7th Cir. 2008). A sentence properly calculated within the guidelines range is presumed reasonable. *Rita v. United States*, --- U.S. ----, 127 S. Ct. 2456, 2462-68 (2007); *Tahzib*, 513 F.3d at 694. A defendant can rebut this presumption by showing that his sentence is unreasonable when considered against the § 3553(a) factors. *United States v. Harvey*, 516 F.3d 553, 556 (7th Cir. 2008). Campos has not rebutted this presumption.

Campos asserts that the district court failed to consider his pretrial conditions as a mitigating factor.[7] The

---

[7] He complains that he was incarcerated in county jail facilities without: work or education programs; adequate recreation,

(continued...)

record, however, establishes that the district judge did consider Campos's pretrial conditions even though the judge did not view them as a proper consideration for mitigating the sentence. Pretrial conditions of confinement are not included in the § 3553(a) factors, *United States v. Martinez*, 520 F.3d 749, 752-53 (7th Cir. 2008); *United States v. Ramirez-Gutierrez*, 503 F.3d 643, 646 (7th Cir. 2007), and we have not decided whether extraordinarily harsh conditions of confinement could ever justify a reduced sentence. But even if unduly harsh conditions could justify a lower sentence, Campos has not supported his claims of his pretrial conditions with any evidence. He cites merely to his objections and corrections to the presentence report, which are not supported by evidence. And even if Campos had properly supported his claim, the conditions about which he complains do not compare with those which have been found by other circuits to justify a reduced sentence. *See, e.g.*, *United States v. Pressley*, 345 F.3d 1205, 1219 (11th Cir. 2003) (concluding length and conditions of defendant's pre-sentence confinement—for six years, five of which were in a 23-hour-a-day lock down and where defendant had not been outside in five years—were not insufficient as a matter of law

---

[7] (...continued)

security, or medical care, particularly for his ear condition; kosher and nutritional foods; and religious services, a law library, newspapers or magazines. He also complains that his visitation with family and counsel was restricted and that the jail facilities were such that he could not review the electronic evidence against him.

to support a downward departure); *United States v. Carty*, 264 F.3d 191, 193 (2d Cir. 2001) (remanding for consideration of defendant's request for downward departure for pre-sentence conditions of confinement where defendant had been held eight months in a Dominican prison in an unlit four-by-eight-foot cell with three or four other inmates; he had no light in his cell; he had 10 to 15 minutes per day outside his cell to bathe; he had no running water in his cell; he had no paper, pens, newspaper, or radio; and was allowed only one phone call a week). In short, we find no procedural error in the sentencing process, nor do we find that the sentence in this case is unreasonable.

### III. Conclusion

For the foregoing reasons, Campos's convictions and sentence are AFFIRMED.