**UNITED STATES of America**

**v.**

**Jesus MADRID TN: Jesus Madrid a.k.a. Ramon Roberto–Flores a.k.a. "Chuy" a.k.a. "Chuchis" a.k.a. "William Levy" Billy Omar Ruvalcaba–Madrid a.k.a. "Chino."**

No. EP–11–CR–2903–DB(2),(4).

United States District Court,
W.D. Texas,
El Paso Division.

Sept. 25, 2012.

Michael Rose Whyte, U.S. Attorney's Office, El Paso, TX, for United States of America.

John Lee Granberg, Ruben Nunez, Attorney at Law, El Paso, TX, for Jesus Madrid.

## MEMORANDUM OPINION AND ORDER

DAVID BRIONES, Senior District Judge.

Before the Court are Defendants Jesus Madrid ("Madrid") and Billy Omar Ruvalcaba–Madrid's ("Ruvalcaba") (collectively "Defendants") Motions to Suppress Wiretap Evidence [ECF Nos. 168, 169] and the United States of America's ("the Government") respective Response [ECF Nos. 174, 175]. Also before the Court are Defendants' Motions to Reconsider Motion to Suppress [ECF Nos. 200, 201] and the Government's respective Responses [ECF Nos. 204, 206]. For the reasons that follow, the Court finds that Defendants' Motions should be denied.

## BACKGROUND

On November 22, 2011, a Grand Jury sitting in the Western District of Texas returned an Indictment charging Defendants with three counts of alleged violations of federal anti-narcotics laws.[1] During the course of the prior investigation leading to the Indictment, the Government sought and obtained four orders authorizing the interception of wire communications from United States ("U.S.") District Judge Kathleen Cardone ("Judge Cardone") on May 19 ("the May 2011 wiretap"), June 24 ("the June 2011 wiretap"), July 25 ("the July 2011 wiretap"), and September 22, 2011 ("the September 2011 wiretap"), respectively. Pursuant to Title III of the Omnibus Crime Control and

---

1. Count One alleges that on or about May 1, 2011, Defendants knowingly conspired to possess a controlled substance involving fifty kilograms or more of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(C). Count Two alleges that on or about August 14, 2011, Defendants knowingly possessed with intent to distribute a detectable amount of marijuana in violation of 21 U.S.C. § 841(a)(1). Finally, Count Three alleges that on or about August 16, 2011, Defendants knowingly possessed with intent to distribute a detectable amount of marijuana, also in violation of 21 U.S.C. § 841(a)(1).

Safe Streets Act of 1968 ("Title III"), Judge Cardone issued each order after reviewing an application signed by the U.S. Attorney for the Western District of Texas and an affidavit subscribed by an agent of the U.S. Drug Enforcement Agency ("DEA"). Through the instant Motions, Defendants challenge the sufficiency of these applications and affidavits under Title III and under the Fourth Amendment to the U.S. Constitution ("the Fourth Amendment"),[2] and they pray that the Court suppress evidence seized as a result of the wiretaps.

## LEGAL STANDARDS

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. The Fourth Amendment Warrant Clause ensures that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* Moreover, the Fourth Amendment "protects individual privacy against certain kinds of governmental intrusions," *Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and the "touch-

stone of Fourth Amendment analysis is reasonableness," *United States v. Brigham,* 382 F.3d 500, 507 (5th Cir.2004) (quoting *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)).

Congress passed Title III seeking to protect individual privacy while also allowing law enforcement to use "electronic surveillance as a weapon against the operations of organized crime." *See United States v. Kahn,* 415 U.S. 143, 151, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); S.REP. No. 90–1097, at 66–76 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2185–95. Title III contains a series of procedural and substantive safeguards aimed at striking a balance between these two competing interests. For example, Title III requires the Government to obtain an order authorizing a wiretap by submitting a written application, upon oath or affirmation, describing the particular offense under investigation, the location where the communication will be intercepted, the type of communications sought, and the identity of the person committing the offense. 18 U.S.C.A. § 2518(1)(b) (West 2012).[3] Other safeguards include a probable cause requirement, *id.* §§ 2518(3)(a), (b) & (d), a showing of "necessity," *id.* §§ 2518(1)(c) & (3)(c), and a "notice" requirement, *id.* § 2518(8)(d).[4]

---

**2.** Although Defendants allege that their Motions are "made pursuant to the Fourth Amendment," the Court does not construe their arguments as a facial challenge to Title III's constitutionality. Even if they do facially challenge the statute, that argument is foreclosed by *United States v. Sklaroff,* 506 F.2d 837, 840 (5th Cir.1975), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975).

**3.** Section 2518(1)(b) provides in full as follows: "Each application shall include the following information ... (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be commit-

ted, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted." *Id.* § 2518(1)(b).

**4.** The probable cause and necessity requirements are discussed *infra.* The notice requirement requires that persons named in the wiretap application or order be served with an inventory, which gives "notice of the entry of the order or application, state[s] the dispo-

## DISCUSSION

Defendants petition the Court to suppress evidence seized as a result of the wiretaps, arguing that the wiretap applications and affidavits in the instant cause lacked a showing of probable cause as to each Defendant and contained material misrepresentations and/or omissions without which Judge Cardone would not have found probable cause.[5]

■ Before addressing Defendants' arguments, the Court notes that Ruvalcaba lacks standing to challenge the May 2011 wiretap. Section 2518(10)(a) provides that "any 'aggrieved person' may suppress the contents of an unlawfully intercepted communication or evidence derived therefrom." *United States v. Scasino*, 513 F.2d 47, 49 (5th Cir.1975). The statute defines an aggrieved person as "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." 18 U.S.C.A. § 2510(11). *Alderman v. United States* explains that " 'aggrieved person' ... should be construed in accordance with existent standing rules" for wiretap cases. *Alderman v. United States*, 394 U.S. 165, 175 n. 9, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). The United States Court of Appeals for the Fifth Circuit ("the Fifth Circuit") has interpreted *Alderman* to mean that "[u]nder prestatutory fourth amendment law, one does not have standing to suppress an illegal wiretap unless his conversations were overheard or the conversations occurred on his premises." *Scasino*, 513 F.2d at 50. Here, Ruvalcaba was not a party to any intercepted communications resulting from the May 2011 wiretap nor did any of the conversations occur on his premises. Moreover, the interception was not directed against him. Nevertheless, the Government failed to raise this argument. Therefore, the Court deems this argument waived and considers Ruvalcaba's arguments as to the May 2011 wiretap. The Court now examines Defendants' arguments below.

### I. Whether the wiretap applications / affidavits lacked probable cause

■ Defendants challenge the wiretap applications and affidavits as lacking probable cause. Without citing to any authority whatsoever to support their position,[6] Defendants first argue that the wiretap applications and affidavits are deficient because they lack a showing of probable cause as to each Defendant. Second, Defendants allege that the wiretap applications and affidavits are deficient because

---

sition of the application, and indicate[s] whether communications were intercepted." *United States v. Donovan*, 429 U.S. 413, 428–29, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); *see also* 18 U.S.C.A. § 2518(8)(d). "The inventory notice must be served within a reasonable time but not later than 90 days after the date the application for an intercept order was filed. On an ex parte showing of good cause, service of the inventory may be postponed." *Donovan*, 429 U.S. at 429 n. 18, 97 S.Ct. 658.

5. Defendants also allege that they were not served with inventory notice as required by 18 U.S.C. § 2518(8)(d). Nevertheless, Defendants' allegations are without merit as the Government provided the Court with proof of timely service on both Defendants.

6. This is just one example where Defendants raise issues of first impression or make conclusory assertions without citing to any authority or without properly briefing the Court on the issues they present. The Court cautions Defendants that the revised Local Criminal Rules now require Parties to "cite the legal authority upon which" they rely when filing a motion or response. W.D. Tex.Crim. R. 47(a)(1). Moreover, "[a] wiretap order is presumed proper and the defendant must bear the burden of overcoming this presumption." *United States v. Iiland*, 254 F.3d 1264, 1268 (10th Cir.2001); *see also United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir.1977) ("[T]he burdens of production and persuasion generally rest upon the movant in a suppression hearing.").

they contain material misrepresentations and/or omissions without which Judge Cardone would not have found probable cause. The Court examines these arguments in turn.

### A. Whether the Fourth Amendment or Title III require the government to make a showing of probable cause as to each individual named in a wiretap application and affidavit

■ "It is axiomatic that in order to obtain a wiretap pursuant to Title III, as when seeking a search warrant, the government must make a showing of probable cause." *United States v. Bannerman*, No. Crim. 03–10370–DPW, 2005 WL 2323172, at *3 (D.Mass. Aug. 25, 2005); *see also* U.S. CONST. AMEND. IV; 18 U.S.C.A. §§ 2518(3)(a), (b) & (d). Nevertheless, whether the Fourth Amendment and Title III require the Government to make a showing of probable cause for each individual named in a wiretap application and affidavit is a question of first impression within the Fifth Circuit. Several federal appellate and district courts that have addressed the issue—including district courts within the Fifth Circuit—have found, however, that neither the Fourth Amendment nor Title III require a showing of probable cause as to each individual named in the application and affidavit. *E.g.*, *United States v. Domme*, 753 F.2d 950, 954 n. 2 (11th Cir.1985); *United States v. Figueroa*, 757 F.2d 466, 475 (2d Cir.1985) ("[T]he government need not establish probable cause as to all participants in a conversation. If probable cause has been shown as to one such participant, the statement of the other participants may be intercepted if pertinent to the investigation.") (citing

*United States v. Tortorello*, 480 F.2d 764, 775 (2d Cir.1973)); *United States v. Martin*, 599 F.2d 880, 884–85 (9th Cir.1979), *overruled on other grounds by United States v. DeBright*, 730 F.2d 1255 (9th Cir.1984) (*en banc*); *see also United States v. Vargas*, 116 F.3d 195, 197 n. 1 (7th Cir.1997) (no probable cause needed to simply list a defendant in a wiretap application as a probable converser); *United States v. Little*, Crim. Action No. 11–189–01, 2012 WL 489194, at *3 (W.D.La. Feb. 14, 2012) ("There is no requirement for probable cause to be demonstrated as to every individual who is named as a target interceptee."). This conclusion is further supported by case law delineating the constitutional requirements of wiretap statutes generally and by a plain reading of the statute at issue here.

■ In *Berger v. New York*, the United States Supreme Court ("the Supreme Court") struck down, under the Fourth Amendment, a New York statute that permitted a judge to issue an *ex parte* wiretap order after a district attorney or police officer provided an oath or affirmation stating that "reasonable grounds" existed to believe that evidence of a crime would be obtained; particularly describing "the person or persons whose communications, conversations or discussions [were] to be overhead or recorded"; and identifying "the particular telephone number or telegraph line involved." *Berger v. New York*, 388 U.S. 41, 54, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (internal quotations omitted). While the Supreme Court declined to decide whether the statute was constitutionally infirm because it allowed the State to obtain a wiretap warrant on less than probable cause,[7] the Supreme Court found

---

7. The State argued that the "reasonable ground" requirement in the statute satisfied the Fourth Amendment's probable cause requirement. *Berger*, 388 U.S. at 55, 87 S.Ct. 1873. Nevertheless, the Supreme Court stated that it "need not pursue the question [of whether the statute requires a showing of probable cause] ... because we have concluded that the statute is deficient on its face in other respects." *Id.*

the statute deficient because it lacked the Fourth Amendment's "particularization" requirement. *Id.* at 55, 87 S.Ct. 1873. The Supreme Court explained:

> The Fourth Amendment commands that a warrant issue not only upon probable cause supported by oath or affirmation, but also 'particularly describing the place to be searched, and the persons or things to be seized.' New York's statute lacks this particularization. It merely says that a warrant may issue on reasonable ground to believe that evidence of crime may be obtained by the eavesdrop. It lays down no requirement for particularity in the warrant as to what specific crime has been or is being committed, nor 'the place to be searched,' or 'the persons or things to be seized' as specifically required by the Fourth Amendment.

*Id.* at 55–56, 87 S.Ct. 1873 (quoting U.S. CONST. amend. IV). In a subsequent opinion, the Supreme Court explained that the Fourth Amendment's particularization requirement in a wiretap context is satisfied when the applicant identifies "the telephone line to be tapped and the particular conversations to be seized." *United States v. Donovan,* 429 U.S. 413, 427 n. 15, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). But the Supreme Court explained that "[i]t is not a constitutional requirement that all those likely to be overheard engaging in incriminating conversations be named." *Id.; see also United States v. Kahn,* 415 U.S. 143, 155 n. 15, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974) ("[A]s long as the property to be seized is described with sufficient specificity, even a warrant failing to name the owner of the premises at which a search is directed, while not the best practice, has been held to pass muster under the Fourth Amendment."). Moreover, as already stated, the touchstone of any Fourth Amendment analysis is reasonableness. *Brigham,* 382 F.3d at 507. Because the Fourth Amendment does not require the Government

to list all individuals likely to be overheard engaging in incriminating conversations in its wiretap applications and affidavits, it would be anomalous and unreasonable for the Fourth Amendment to require a wiretap applicant and affiant to make a showing of probable cause as to each and every individual named in the wiretap application and affidavit. As such, the Court finds that the Fourth Amendment does not require the Government to make a showing of probable cause as to each individual named in the wiretap. Having so decided, the Court now determines whether Title III requires the Government to make a showing of probable cause as to each named individual.

■ "As in all statutory construction cases, [courts] begin with the language of the statute." *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). "The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Id.* (internal quotations omitted). "The inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Id.* (internal quotations omitted). Here, the Court need look no further than the plain language of the statute. Title III permits a judge to issue an *ex parte* order authorizing wiretapping after finding that "an individual" has been or will be engaged in criminal activity. 18 U.S.C.A. § 2518(3)(a). The statute says nothing about "individuals," and the Court declines Defendants' invitation to rewrite the statute. This interpretation of the statute is also consistent with other statutory provisions. For instance, § 2518(1)(b)(iv), known as the "naming requirement," does not require the Government to list an individual for whom it lacks probable cause in the wiretap application. *See Kahn,* 415 U.S. at 150–55, 94

S.Ct. 977. Rather, § 2518(1)(b)(iv) only requires the Government to name an individual in the application if it "has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone." *Donovan,* 429 U.S. at 428, 97 S.Ct. 658. The Supreme Court has explained that "[i]f, after evaluating the statutorily enumerated factors in light of the information contained in the application, the judge concludes that the wiretap order should issue, the failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization." *Id.* at 435, 97 S.Ct. 658. Therefore, it would be incongruous for Title III to require the Government to make a showing of probable cause for each person named in the wiretap application if the statute does not even require the Government to name individuals likely to be overheard in an otherwise lawful application.

■ Finally, requiring the Government to make a showing of probable cause as to each individual named in the application does nothing to further the competing policy interests that Title III seeks to balance: "protecting individual privacy" and "authorize[ing] electronic surveillance as a weapon against the operations of organized crime." *Kahn,* 415 U.S. at 151, 94 S.Ct. 977. Specifically, requiring the Government to make a showing of probable cause as to each named individual in the application would create an onerous burden on the Government when Congress instead intended to create a regulatory scheme that would facilitate the Government's ability to eavesdrop on individuals engaged in organized crime. *See* S.REP. No. 90–1097, at 66–76. Therefore, the Court finds that Title III does not require the government to make a showing of probable cause as to each individual named

in the wiretap application and affidavit. Having so decided, the Court now determines whether the wiretap applications and affidavits in the instant cause are deficient because of material misrepresentations and/or omissions.

### B. Whether the wiretap applications and affidavits in the instant cause lack probable cause because of material misrepresentations and/or omissions

■ "An order authorizing a wiretap, like an ordinary search warrant, must of course be supported by probable cause." *United States v. Hyde,* 574 F.2d 856, 862 (5th Cir.1978). "The probable cause required for a Title III wiretap is the same as that required by the Fourth Amendment for a search warrant." *United States v. Green,* No. CRIM.A. 04–295, 2005 WL 1041205, at *2 (E.D.La., April 29, 2005) (quoting *United States v. Milton,* 153 F.3d 891, 894 (8th Cir.1998)). Title III requires a judge to find that there is probable cause to believe that "an individual is committing, has committed, or is about to commit a particular offense enumerated" in the statute. 18 U.S.C.A § 2518(3)(a). In addition, the statute requires the judge to find that there is probable cause that "particular communications concerning [the] offense will be obtained through" the interception." § 2518(3)(b). Finally, except under circumstances not applicable to the instant cause, a judge must also find that there is probable cause to believe "that the facilities from which ... the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used in connection with the commission of such offenses." § 2518(3)(d).

■ "Probable cause does not require proof beyond a reasonable doubt, but only a showing of the probability of criminal activity." *United States v. Froman,*

355 F.3d 882, 889 (5th Cir.2004) (*quoting United States v. Daniel*, 982 F.2d 146, 151 (5th Cir.1993)). "Probable cause is to be gleaned from a common-sense reading of the entire affidavit, informed by indices of reliability that courts have traditionally found worthy of respect." *Hyde*, 574 F.2d at 863 (internal quotations omitted). Courts evaluate probable cause using a totality of circumstances approach. *United States v. Cherry*, 50 F.3d 338, 341 (5th Cir.1995).

■■■■ Where "much of the information contained in the supporting affidavit comes from confidential informants, the magistrate's search for probable cause must be guided by and measured against the familiar standards set forth in" *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *Hyde*, 574 F.2d at 862. Under *Aguilar* and *Spinelli*, "the magistrate must be told of the underlying circumstances and particular facts which support the confidential informant's conclusions, and he must also be told why the informant should be considered reliable." *Id.* In other words, courts first examine any underlying facts presented to determine if the facts taken as a whole amount to probable cause. *See id.* at 862–63. Courts then determine whether the informant should be considered reliable by looking for "traditional tokens of reliability." *Id.* at 863. Detailed affidavits are one of the traditional tokens of reliability because they suggest that those who supplied the information have firsthand knowledge of the events. *Id.* Courts also look to see whether the information pro-

vided by the confidential source has been verified by independent investigations. *Id.*

■■■■ Finally, "[s]pecial problems are presented when the affidavit in support of the wiretap application allegedly contains intentional or reckless misrepresentations or falsehoods." *United States v. Guerra–Marez*, 928 F.2d 665, 670 (5th Cir.1991). "[I]mplicit in the fourth amendment's Warrant clause is the assumption that factual allegations necessary to support a finding of probable cause must be *truthful*." *Id.* When a wiretap is challenged because of a misrepresentation or falsehood in the affidavit, the Fifth Circuit applies the test that the Supreme Court articulated in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *Guerra–Marez*, 928 F.2d at 670–71. Under *Franks*, when the "defendant makes a 'substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth,' was included in the affidavit, the defendant is entitled to a hearing to contest the validity of the warrant." [8] *Id.* at 670 (quoting *Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674). "Any offending statements are then stricken from the affidavit, and the … warrant is validated only if the reconstructed affidavit satisfies the probable cause requirement." *Id.; see also United States v. Tomblin*, 46 F.3d 1369, 1376–77 (5th Cir.1995).

The Court first makes general observations about all the wiretap applications and affidavits in the instant cause before examining each wiretap application and affidavit in turn to determine if they make a showing of probable cause as required under

---

**8.** Here, Defendants have failed to make a showing that the Government's alleged misrepresentations or omissions were made knowingly or intentionally or with reckless disregard for the truth. Therefore, the Court declines to give Defendants a hearing. And,

as explained further below, even without the alleged deficiencies the Government's affidavits accompanying each wiretap contained sufficient factual matter for Judge Cardone to have found probable cause under the Fourth Amendment and Title III.

the statute. In all of the wiretap applications and affidavits, the Government sought a wiretap order to investigate the following violations of federal law:

a. Possession with intent to distribute a controlled substance and distribution of a controlled substance in violation of 21 U.S.C. § 841(a);

b. Conspiracy to possess with intent to distribute a controlled substance and conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846;

c. Importation of a controlled substance in violation of 21 U.S.C. §§ 952 and 960(a);

d. Conspiracy to import a controlled substance in violation of 21 U.S.C. § 963;

e. Use of a communication facility, namely: a telephone, to commit, facilitate, or further the commission of a felony offense, in violation of 21 U.S.C. § 842(b);

f. Laundering and conspiracy to launder monetary instruments, in violation of 18 U.SC. § 1956;

g. Engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957; and

h. Aiding and abetting in the above offenses in violation of 18 U.S.C. § 2.

In addition to these violations of federal law, the June, July, and September 2011 wiretap applications and affidavits averred that probable cause existed to investigate possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(K).

Moreover, each application and affidavit sought to obtain communications regarding the following:

a. The roles of the target interceptees in the illegal operations;

b. The manner in which the illegal activities would be conducted;

c. Information regarding the distribution/transportation cell(s) being utilized by the organization;

d. Other locations utilized in furtherance of those illegal activities;

e. The full identity and specific location of the target interceptees;

f. And the distribution channels of the contraband and monies utilized in and obtained by the target interceptees.

Finally, each application and affidavit sought to intercept wire communications on cell phones. The Court now examines the facts presented in each of the four affidavits to determine whether Judge Cardone could have found probable cause as required under § 2518(3).

### i) May 2011 wiretap application and affidavit

On May 19, 2011, the Government sought a wiretap order to intercept communications from Target Telephone–1 (TT–1) subscribed to by an unindicted individual named Pedro Alvares Cabral ("Cabral").[9] The affidavit in support of the May 2011 wiretap application linked Cabral and TT–1 to the illicit trafficking of narcotics. The affiant swore that in early May 2011, agents were informed that a source of information observed large amounts of U.S. currency at Cabral's residence and observed an unknown individual deliver a trash bag containing cash to the residence. And as a result of the information, agents began conducting surveillance at Cabral's home on Tierra Nueva Drive. The affiant also swore that in conducting

---

9. Cabral is not the unindicted individual's true name. Cabral's true name was redacted because the Government did not have sufficient information upon which to indict.

their investigation, agents discovered that Cabral was associated with an individual named Bartolomeo de las Casas ("Casas")[10] who in 2007 was caught attempting to bring over fifty kilograms of marijuana into the United States from Mexico at the Bridge of the Americas ("BOTA") port of entry in El Paso, Texas. At the time Casas was apprehended, Casas told federal agents that he resided on Tierra Nueva Drive at the same address where Cabral resides.

Cabral's association with Casas was further corroborated through other sources. For example, Confidential Source 1 ("CS–1") informed the affiant that an individual named "Bartolomeo," then working at a restaurant in El Paso, had been caught smuggling drugs for Cabral a few years back. Based on this information, the affiant interviewed Casas at the BOTA on May 12, 2011. During the interview, Casas confirmed that "Santamaria," one of Cabral's aliases, had promised to pay Casas $1,000 to cross marijuana into the United States from Mexico. Casas explained that it was Cabral who told Casas to pick up the smuggling vehicle at a specific location in Ciudad Juárez, Mexico, ("Juárez") and to drop it off at an apartment complex on Viscount Boulevard in El Paso. Finally, Casas informed the affiant that Cabral promised Casas that Cabral's brother would take Casas back to Juárez after the smuggling operation was complete.

The information Casas and CS–1 provided the affiant is related to additional facts which formed the basis of Judge Cardone's probable cause determination. For instance, on March 10, 2011, U.S. Customs officials apprehended fifty-eight pounds of marijuana ("the March 2011 seizure") at the BOTA from Francisco Pizarro ("Pizarro"),[11] and took Pizarro into custody. A

U.S. Immigration and Customs Enforcement ("ICE") special agent discovered that Pizarro resided at an apartment complex on Viscount Boulevard, the same street in El Paso where Casas was instructed to deliver his load of marijuana in 2007. While in custody, Pizarro informed ICE agents that he worked at a hot dog business that Cabral co-owned. Surveillance of the hot dog business revealed that, unlike legitimate business ventures, it was usually closed during the day, even during peak lunch and dinner hours. CS–1 informed affiant that Cabral said he opens the hot dog business "when he wants to."

The affiant also swore that between February and April 2011, Pizarro made hundreds of calls to TT–1. For example, prison records indicate that during the brief period that Pizarro was in custody in March 2011 for attempting to bring drugs into the United States from Mexico, he made a total of thirteen calls to TT–1. Moreover, using pen registers, agents discovered that a telephone number subscribed to Pizarro made 651 calls to TT–I between February 14 and April 27, 2011. Furthermore, pen registers revealed that a second line subscribed to Pizarro called TT–1 eighty-one times from March 7 to March 9, 2011—the days leading up to the March 2011 seizure of drugs. The affiant averred that forty-five of those calls were placed on March 9, 2011, alone—the day preceding the March 2011 seizure. Currently it is unclear whether Pizarro is in federal custody or at large since the May 2011 affidavit indicates that Pizarro failed to attend his March 16, 2011, preliminary hearing.

The May 2011 affidavit also contains verbatim transcripts of several incriminating conversations between CS–1 and Cabral conducted over TT–1 during April

---

**10.** Casas's true name has been altered to protect his identity.

**11.** Pizarro's true name has been altered to protect his identify.

2011. For example, on April 14, 2011, CS–1 and Cabral discussed a proposed cocaine transaction in which CS–1 informed Cabral that s/he would be traveling to Las Vegas and wanted to purchase cocaine for the trip. In response, Cabral informed CS–1 that he knew a drug dealer in Las Vegas.

Verbatim transcripts of an April 15, 2011, conversation reveal that Cabral attempted to connect CS–1 with Cabral's drug supplier. For instance, Cabral told CS–1 that his drug supplier would visit CS–1 to provide him/her with the supplier's telephone number. Moreover, Cabral told CS–1 that Cabral did not expect to turn a profit from selling CS–1 cocaine but stated that CS–1 would have to give Cabral some of the cocaine from the supplier as payment. Furthermore, agents intercepted a conversation in which CS–1 asked Cabral whether Cabral had confidence in the cocaine supplier. Cabral replied that the supplier was a former police officer who was dismissed from service for corruption, implying that the supplier was in fact trustworthy.

On April 19, 2011, agents intercepted a call in which Cabral and CS–1 discussed Cabral's ability to broker a cocaine transaction so that CS–1 could obtain user quantities of cocaine. Cabral informed CS–1 that he did not sell user quantities of cocaine. Later in the conversation, CS–1 inquired whether Cabral's supplier could obtain larger quantities of cocaine for resale. In response, Cabral asked CS–1 how much cocaine s/he wanted to buy. During a second April 19, 2011, telephone conversation, Cabral and CS–1 continued to discuss the cocaine for resale. Cabral stated that he would help CS–1 obtain the larger quantity of cocaine, but that he did not want CS–1 telling people that he had distributable quantities of cocaine. Finally, Cabral told CS–1 that he would send CS–1 a photograph of the stash to show that he possessed the drugs.

Based on this information, and evaluating the totality of circumstances, the Court finds that the affidavit contained more than enough facts for Judge Cardone to find that there was probable cause to believe that Cabral was engaged in the enumerated violations of federal law. Moreover, the affidavit provides more than enough facts to make a showing of probable cause to believe that intercepting wire communications from TT–1 would aid agents in learning about the manner in which Cabral's criminal organization functioned.

The Court would reach the same conclusion even if it were to strike from the affidavit the facts Defendants allege are misrepresentations. For example, Defendants allege that Madrid is not the individual the Government alleges was arrested in November 2008. Nevertheless, this issue is unrelated to the above-mentioned facts, which Judge Cardone could have relied upon to make a finding of probable cause. Likewise, Defendants challenge Judge Cardone's finding of probable cause because Cabral was never indicted. It is irrelevant that Cabral was never indicted since a prosecutor has discretion to decline prosecution even if there is probable cause to believe that an individual has committed a crime. *See Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

The Court's finding of probable cause is also undisturbed by Ruvalcaba's attempt to discredit Government witnesses and informants. Ruvalcaba first argues that the May 2011 wiretap affidavit lacked a showing of probable cause be-

cause the Government's Response brief to Ruvalcaba's Motion "lays all of its probable cause determination for the wiretap of TT–1" on the Government's interview with Casas at the BOTA and on a May 12, 2011, interview in which Casas admitted to smuggling narcotics for the user of TT–1. But even if the Government's response brief did "lay all of its probable cause determination" on these two facts, the May 2011 affidavit contained additional facts to support Judge Cardone's finding of probable cause: the fact that Casas listed Cabral's address as his own when he was apprehended in 2007 at the BOTA; the hundreds of telephone calls between Pizarro's telephone lines and TT–1; the connection between Pizarro and Cabral's hot dog business, information which could raise an inference that Cabral's hot dog business was not a valid business but a front for illegal narcotics; and the April 2011 conversations between Cabral and CS–1 regarding Cabral's cocaine supplier.

 Ruvalcaba also avers that the May 2011 wiretap affidavit lacked probable cause due to the Government's misrepresentation of Casas's interview with the affiant. Specifically, in the Government's Response to Ruvalcaba's Motion, the Government avers that once the affiant interviewed Casas, Casas "refused to cooperate further." Ruvalcaba implies that the affiant made a material misrepresentation to the Court by not stating in the affidavit that Casas refused to cooperate further and cites *United States v. Ippolito*, 774 F.2d 1482 (9th Cir.1985), to support his argument. Moreover, Ruvalcaba argues that Casas was not a reliable witness because the affiant did not include a statement in the affidavit regarding Casas's track record of credibility.

These arguments lack merit. The affiant indicated on page 50 of the affidavit that agents had been unable to locate Ca-

sas but that the affiant would interview him if he was located. Even if Casas never explicitly stated that he would cooperate no further, agents could have reasonably inferred that he would not cooperate from his unavailability. Moreover, the Court finds that by indicating that agents could not find Casas, the affiant put Judge Cardone on notice that Casas was unavailable so that Judge Cardone could factor in this consideration when determining whether a wiretap was necessary.

Furthermore, Ruvalcaba's argument lacks merit because *Ippolito* is inapposite. In *Ippolito*, the United States Court of Appeals for the Ninth Circuit ("the Ninth Circuit") suppressed evidence obtained from a wiretap because the wiretap affidavit lacked a showing of necessity after a Government agent told an informant to say he would not testify at trial when, in reality, the informant was willing to testify. *Ippolito*, 774 F.2d at 1482. *Ippolito* is easily distinguished from the instant case. First, the record does not indicates that the affiant in this case coached Casas to say that he would not testify, and second, nothing in the record contradicts the Government's representation to the Court that Casas refused to testify. Moreover, while Casas's decision not to testify could impact a finding of necessity, it does nothing to alter a finding of probable cause as Casas's statements clearly show that Cabral has a history of involvement with the illegal trafficking of narcotics.

Finally, even if the affidavit failed to include a statement regarding Casas's track record for reliability, the Court finds Casas's testimony to be reliable. First, Casas acknowledged working with Cabral to traffic marijuana into the United States—a statement against his penal interests. The Fifth Circuit has acknowledged the inherent reliability of statements that tend to subject the speaker to criminal liability.

*Hyde,* 574 F.2d at 863. Moreover, Casas's interview fit with statements made by other informants. For example, CS–1 stated that a man named "Bartolomeo," Casas's first name, was caught a few years ago attempting to smuggle marijuana for Cabral. Moreover, Casas told the affiant that he was to drop off the drug vehicle on Viscount Boulevard just as Pizarro told agents after he was intercepted with a load of marijuana that he lived at an apartment on Viscount Boulevard. Both Casas and Pizarro have been directly linked to Cabral. In short, the Court finds that the Government more than satisfied the probable cause requirements in the May 2011 wiretap affidavit. The Court now turns to the June 2011 wiretap affidavit.

### ii) June 2011 wiretap application and affidavit

■ On June 24, 2011, the Government sought authorization to tap Target Telephone 2 ("TT–2") utilized by indicted co-conspirator Feliciano Alcalá–Oaxaca ("Alcalá"). On May 23, 2011, a source of information ("SOI") informed DEA agents that s/he had observed unfamiliar vehicles coming and going from an apartment located on Springwood Drive in El Paso. As a result of the surveillance and the SOI's tip, DEA agents went to the apartment with a K–9 unit, and the inhabitants consented to a search. During a protective sweep of the apartment, agents found approximately ten AK–47 rifles. An agent from the U.S. Bureau of Alcohol, Tobacco, and Firearms ("ATF") concluded that none of the firearms were manufactured in Texas ("the May 23 seizure of weapons").

On May 25, 2011, DEA and ATF agents interviewed Confidential Source 2 ("CS–2") regarding the seizure of weapons. During the interview, CS–2 produced a signed lease for the Springwood Drive apartment, and CS–2 informed DEA agents that Alcalá offered to live with him but that CS–2 was instructed by Alcalá to put the apartment and utilities in CS–2's name. CS–2 also informed agents that Alcalá provided him/her with funding to pay the rent and the security deposit and that only CS–2 and Alcalá had keys to the residence. CS–2 advised agents that, approximately one week before the seizure, CS–2 helped Alcalá and Alcalá's friend, "Neto," unload the weapons into the apartment from Alcalá's Mustang.

The June 2011 wiretap affidavit included the verbatim transcript of a May 22, 2011, conversation between Cabral and Alcalá after Cabral received an incoming call on TT–1 from Alcalá, using TT–2. During the conversation, Cabral requested a "five-six" from Alcalá, which according to CS–1, is a user amount of cocaine.[12] Cabral also informed Alcalá that Cabral was at "Pockets," a bar on North Zaragoza Road that law enforcement officers aver is frequented by drug traffickers. Moreover, agents indicate that drug traffickers routinely utilize lookouts in Pockets's parking lot.[13] Cabral asked Alcalá to go to Pockets that evening and stated that he would wait for Alcalá to arrive.

The June 2011 wiretap affidavit also contained the verbatim transcript of a May 23, 2011, call Cabral received on TT–1 from Alcalá, using TT–2. During the call, Cabral expressed frustration that Alcalá did not personally deliver the cocaine at Pockets but instead sent an individual called "Rica" in his place. Moreover, Cabral complained that Rica delivered poor

---

**12.** The affiant swears that CS–1 "has provided reliable, corroborated information in the past...."

**13.** The affiant avers that DEA agents observed Cabral enter Pockets prior to the telephone call, but agents terminated surveillance of Cabral prior to the telephone call because it was difficult to observe him inside the bar.

quality cocaine. In response, the affiant alleged, Alcalá attempted to pacify Cabral by stating that he would send Cabral more drugs.

The affidavit also included the verbatim transcript of a May 26, 2011, conversation between Cabral and Madrid using TT–1 and TT–2, respectively. During the conversation, Madrid and Cabral discussed the May 23 seizure of weapons from the Springwood Drive apartment. Madrid informed Cabral that he was paying Alcalá $3,500 every four to five days. While much of the conversation was spoken in code, the affiant interpreted the conversation to mean that Madrid was using Alcalá to distribute drugs and to collect drug proceeds. Moreover, the affiant explained that Madrid was advising Cabral of the events as a warning to Cabral, due to Cabral's relationship with Alcalá.[14]

The affiant also alleged that CS–2 invoked a meeting with Alcalá to discuss the May 23 seizure of weapons. A review of pen register data confirmed the communication. During the meeting, Alcalá asked CS–2 if the police had approached CS–2 and Alcalá discussed with CS–2 that an individual named "Neto" provided CS–2 with the weapons and an undetermined amount of cocaine to store. Furthermore, the affidavit contains a verbatim transcript of a conversation between Cabral and Alcalá which reveals that Cabral asked Alcalá for "*nenas*," code for an undetermined amount of drugs. Finally, Alcalá informed Cabral that Alcalá had some "pictures" of

his "aunt Crystal" available. The affiant alleges that Alcalá was referring to crystal methamphetamine.

Based on this information, and evaluating the totality of circumstances, Judge Cardone could have found that there was probable cause to believe that Alcalá was engaged in drug trafficking and that there was probable cause to believe that the DEA would intercept conversations regarding drug trafficking over TT–2. This finding is undisturbed even if, as Madrid avers, the June 2011 wiretap affidavit contains exculpatory evidence.[15] This alleged exculpatory evidence does nothing to undermine the facts outlined above, which militate in favor of a finding of probable cause as to other users of TT–2.[16] Moreover, Madrid's claim that probable cause was lacking because the Government failed to disclose to Judge Cardone that Madrid had been in state custody since June 6, 2011, also does nothing to undermine the Court's finding of probable cause. Madrid argues that his detention in state custody "negat[ed] the need for telephonic interception as to him during that time period." This argument, however, goes to necessity and not to probable cause. However, as explained below, the Government is not required to make a showing of necessity as to each and every individual named in the affidavit. Therefore, because the Court finds that the June 2011 affidavit contains sufficient factual information for Judge Cardone to have found probable cause, the Court now reviews the July 2011 affidavit.

14. The affiant states that "[i]t is common for drug trafficking associates to make each other aware of arrests and seizures in order to decrease the likelihood they will be arrested in the future."

15. Specifically, the affidavit contains the verbatim transcript of a conversation between Madrid and Cabral in which Madrid states that he "[didn't] know what the hell" some guys were doing, and that he "[didn't] want to

get involved." Moreover, Madrid also states, "I don't want to know anything about that anymore, I already saw the light."

16. Moreover, the Court has already found that the Government does not have to make a showing of probable cause as to each individual named in the affidavit as long as there are sufficient facts to find probable cause considering the totality of circumstances.

### iii) July 2011 wiretap application and affidavit

In July 2011, agents sought an order authorizing the continued interception of TT–2. The July 2011 wiretap affidavit contained the verbatim transcript of a June 25, 2011, conversation between Alcalá and an unidentified male discussing the price and transportation of cocaine to Maryland. Agents also intercepted text messages from June 29 and 30, 2011, in which Alcalá inquired about the sale of methamphetamine and transportation of narcotics.

Agents also intercepted a July 1, 2011, telephone call between Alcalá and indicted co-conspirator Armando Cereceres ("Cereceres") in which the affiant swears that Alcalá was trying to get rid of a large amount of marijuana and was asking Cereceres if his associate wanted the marijuana. Moreover, the affiant alleged that based on the nature of a subsequent topic of discussion, he believes that Alcalá and Cereceres were involved in the manufacture of methamphetamine.

Agents further intercepted a telephone call Alcalá placed on July 1, 2011, to Cereceres from TT–2. During the call, Alcalá and Cereceres continued to negotiate the price of the narcotics which would be shipped to Maryland and discussed the difficulty they faced in distributing the marijuana because of its high price. Finally, Alcalá and Cereceres expressed concern over the potential profit they would make from the drug sale.

Agents intercepted a third telephone call Alcalá placed on July 1, 2011, to an unknown telephone subscriber from TT–2. The unknown individual explained to Alcalá that a group of individuals who were supposed to drop off a load of drugs never arrived. The affidavit also summarized a conversation between Alcalá and Cereceres on the same day in which Alcalá confirmed that he had just completed a drug deal with Cereceres's friend at a gas station on the corner of Rojas Drive and Joe Battle Boulevard in El Paso. The friend was driving a blue Dodge Ram ("Ram"). Agents observed the transaction and alerted the El Paso County Sheriffs Department. An El Paso County Sheriff's deputy conducted a traffic stop of the Ram, and the driver was cited for possession of drug paraphernalia. Furthermore, during the conversation, Alcalá informed Cereceres about a load of suspected narcotics that law enforcement agents intercepted. Eight minutes later, Alcalá received an incoming call from Cereceres and informed Cereceres that the "job did not happen." In other words, Alcalá was informing Cereceres that the load of drugs had been intercepted by law enforcement agents.

The affidavit also indicated that on July 3, 2011, Alcalá sent a series of text messages to an unknown telephone subscriber. Alcalá explains that things are "hot for him" at the moment, which agents interpret to mean that Alcalá was worried about law enforcement. Additional text messages state, "THEY'RE AFTER ME AGAIN DUDE FBI STOPPED ME AGAIN," and "THANKS ALOT [sic] PARTNER! ! ! BUT EVERYTHING IS REALLY HOT FOR ME AGAIN DEA CAME DOWN ON ME." The affiant swore that later the same evening, Alcalá sent the following text messages to an individual named Tury Hernandez: "THEY CAME TO MY HOUSE"; "THEY WERE QUESTIONING ME FOR AN HOUR AND A HALF AND I DIDN'T LET THEM INSIDE UNTIL THE SEARCH WARRANT GOT THERE"; "OH SHIT WELL DON'T SAY ANYTHING ELSE CALL ME WHEN YOU CAN ... AND WE'RE THERE FOR WHATEVER YOU NEED...."

The July 2011 wiretap affidavit also contained a series of text messages between Alcalá and an unknown female which were sent between July 4 and 5, 2011. The two discussed the transportation of a load of narcotics from El Paso to Oklahoma. Alcalá informed the female that he would tell her what to say when she crossed the checkpoint on her way to Oklahoma. The section on probable cause in the wiretap application contains additional facts. Nevertheless, based on the aforementioned information alone, and evaluating the totality of circumstances, the Court finds that there was more than enough evidence for Judge Cardone to have found probable cause to believe that Alcalá was engaged in drug trafficking and probable cause to believe that the DEA would intercept conversations regarding drug trafficking over TT–2.[17] Having so decided, the Court turns to the September 2011 wiretap application and affidavit.

### iv) September 2011 wiretap application and affidavit

In September 2011, the Government sought authorization to tap Target Telephone 3 ("TT–3") utilized by Defendant Jesus Madrid. The application indicated that communications intercepted over TT–2 revealed that Madrid coordinated the distribution of multiple pounds of marijuana smuggled into the United States from Mexico. The affidavit contained the verbatim transcript of an August 13, 2011, conversation between Madrid and Alcalá in which Alcalá informed Madrid that Alcalá recruited co-defendant Eddie Escarzaga ("Escarzaga") for use of his residence to store narcotics. Madrid then asks Alcalá to "tell [Escarzaga] what the deal is" and to "guide [Escarzaga]" so that Madrid "won't have to get into it there." The affiant interpreted these statements to mean that Madrid was "attempting to remove himself from the storage and distribution of narcotics in order to insulate himself from possible prosecution." The affiant also interpreted the statement, "take care of it," to mean that Madrid is senior to Alcalá in the organization's hierarchical structure. Further, during the conversation, Madrid asked Alcalá if Escarzaga was trustworthy. Alcalá responded that Escarzaga is a "twenty-one," meaning that Escarzaga is a member of the Barrio Azteca gang. Moreover, Madrid asked Alcalá if they could smuggle narcotics from Mexico two to three times per week in two to three vehicles per week. Alcalá agreed.

The affiant reported that on August 14, 2011, agents began conducting surveillance of Alcalá at approximately 12:15 p.m. At 12:46 p.m., agents intercepted a call in which Alcalá asked an individual named Sonora to meet him at a gas station on the corner of Montwood Drive and Joe Battle Boulevard. At 12:50 p.m., agents observed Alcalá arrive at the gas station driving the Mustang and meet with an individual

---

**17.** The Court's conclusion is not disturbed by the affiant's statement in the section entitled probable cause that "I am not aware of any applications that have been made to any court in the United States for authorization to intercept wire or electronic communications for Target Telephone–2," followed two paragraphs later with an acknowledgment that Judge Cardone had authorized interception of wire communications over TT–2 in June 2011. Moreover, the July 2011 wiretap application states that the Government sought an order to *continue* intercepting communications over TT–2. Although the affiant presents contradictory statements, the Court does not conclude that these contradictions amounted to intentional or reckless misrepresentations or falsehoods. Indeed, when the entire wiretap application and affidavit are read as a whole, it is clear that the contradictions were likely due to a clerical error and not an attempt to mislead or make misrepresentations to the Court because the affidavit makes clear that the Government seeks to continue intercepting calls from TT–2.

parked in a Ford Explorer ("the Explorer"). Agents then observed the Mustang and the Explorer depart in tandem and arrive at a home on Sun Bridge Place in El Paso.

While Alcalá and the driver of the Explorer were inside the residence, agents intercepted a call from Alcalá to Ruvalcaba in which Alcalá informed Ruvalcaba that Alcalá and "the guy who writes" are on their way. At the same time, agents observed a white Ford Taurus ("the Taurus") with Chihuahua State license plates park in front of the Sun Bridge Place residence. The affiant further swore that at approximately 3:28 p.m., agents intercepted a call in which Alcalá called Escarzaga to ask for Escarzaga's address. Escarzaga provided an address on Tierra Humeda Drive. Moreover, Alcalá informed Escarzaga that Ruvalcaba and a friend were at Madrid's home but were on their way to Escarzaga's home.

At 3:36 p.m., an agent observed an individual in a red shirt enter the Taurus and depart the Sun Bridge Place residence. Agents followed, and an El Paso County Sheriff's deputy pursued the vehicles and conducted a traffic stop of the Taurus. Deputies identified the driver of the vehicle as Jose Manuel Campa ("Campa"). Campa gave the deputy consent to search the Taurus. As deputies searched the Taurus, Alcalá received a telephone call from Ruvalcaba in which Ruvalcaba stated that Campa had been stopped. Ruvalcaba then asked Alcalá if Ruvalcaba could speak with Madrid. Ruvalcaba informed Madrid that he was worried that the deputies would find the "clavo." The affiant swore that based on his experience, a "clavo" is a term utilized by drug traffickers to refer to a hidden compartment located in a vehicle to store drugs.

In response, Madrid advised Ruvalcaba to send Campa a text message telling him not to act nervous. Agents removed a total of sixty-seven bundles of marijuana from all four of the Taurus's tires. Deputies arrested Campa, and he is currently pending state charges. At 10:13 p.m., Alcalá sent a text message to Madrid inquiring about Campa. Madrid responded that Campa was not in the system yet, and Alcalá replied, "Oh shit!!" The affiant swore that Madrid's response indicates that Madrid was concerned that Campa was cooperating with law enforcement. The affiant explained that intercepted communications reveal that bail bond companies provide members of drug trafficking organizations with updates regarding arrestees and that drug traffickers assume that if an individual is not immediately placed in the booking database, the individual is cooperating with law enforcement. The section on probable cause in the wiretap application contains additional facts. Nevertheless, based on the aforementioned information, and evaluating the totality of circumstances, the Court finds that there was more than enough evidence for Judge Cardone to have found probable cause to believe that Alcalá was engaged in drug trafficking and probable cause to believe that the DEA would intercept conversations concerning drug trafficking over TT–3. Because the Court has now found that all four wiretap affidavits and applications made a showing of probable cause, the Court now examines Defendants' arguments as to the necessity requirement.

## II. Whether the wiretap applications and affidavits lacked a showing of necessity

Without any explanation and citing only to one case from the United States Court of Appeals for the Tenth Circuit ("the Tenth Circuit"), Defendants first argue that the wiretap applications and affidavits were deficient because the Government failed to make a showing of necessity as to each Defendant. Defendants next argue

that even if the Government did make a showing of necessity as to each Defendant, the necessity sections in the wiretap applications for TT–1 are deficient because they contain conclusory statements and declarations. Moreover, Defendants argue that the June and July 2011 wiretap affidavits are deficient because they merely bootstrap information from the May 2011 wiretap application to make a showing of necessity. The Court evaluates these arguments below.

### A. Whether Title III requires a showing of necessity as to each named individual [18]

Whether Title III requires a showing of necessity as to each named individual appears to be a question of first impression within the Fifth Circuit. As the Court has already stated, in all statutory construction cases, the Court begins with the language of the statute. *Barnhart,* 534 U.S. at 450, 122 S.Ct. 941. Title III requires the Government's wiretap application to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C.A. § 2518(1)(c). Moreover, the statute explains that a judge can enter an *ex parte* wiretap order after finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C.A. § 2518(3)(c). Taken together, these two provisions form Title III's necessity requirement.

■ Unlike other Title III provisions which deal with the subjects of surveillance, *see e.g.,* 18 U.S.C.A. §§ 2518(1)(b)(iv) & (3)(a), the necessity provisions focus strictly on the Government's investigative procedures and techniques. Indeed, the necessity provisions require the Court to examine the panoply of normal investigative techniques available to the Government and to determine whether under the circumstances of the particular case, the Government can reasonably carry them out safely and with relative success. But neither necessity provision says anything about individuals. As such, the Court does not read either provision as requiring the Government to make a showing of necessity as to each individual likely to be overheard over the intercepted communications.

Other Courts that have addressed the issue have found that the Government is not required to make a showing of necessity as to each individual named in the wiretap application. For instance, the Ninth Circuit has explained that

> the necessity requirement is directed to the objective of the investigation as a whole, and not to any particular person. If the Government can demonstrate that ordinary investigative techniques would not disclose information covering the scope of the drug trafficking enterprise under investigation, then it has established necessity for the wiretap. As with probable cause, the government has no duty to establish necessity as to each possible interceptee. It is sufficient that there was necessity to tap the phone.

*United States v. Reed,* 575 F.3d 900, 911 (9th Cir.2009) (internal quotations and citations omitted). Likewise, the Tenth Circuit and other courts within the Tenth Circuit have also arrived at the same conclusion. *See, e.g., United States v. Mitchell,* 274 F.3d 1307, 1311 (10th Cir.2001) ("The argument is that … the necessity requirement of 18 U.S.C. § 2518(1)(c) be

**18.** Defendants do not argue that "necessity" is a constitutional requirement. As such, the Court does not address whether the Fourth Amendment requires a showing of necessity as to each named individual.

shown as to all named interceptees. We do not agree with this argument."); *see also United States v. Carrillo*, 123 F.Supp.2d 1223, 1247 (D.Colo.2000), *appeal dismissed*, 43 Fed.Appx. 226 (10th Cir. 2002); *United States v. Barrios*, 994 F.Supp. 1257, 1263 (D.Colo.1998). It is telling that the Tenth Circuit has rejected Defendants' argument, as the only case Defendants cite in support of their argument is a Tenth Circuit opinion: *United States v. Castillo–Garcia*, 117 F.3d 1179 (10th Cir.1997), *overruled on other grounds by United States v. Ramirez–Encarnacion*, 291 F.3d 1219 (10th Cir.2002).

■ Nevertheless, *Castillo–Garcia* is inapposite.[19] The defendants in *Castillo–Garcia* filed a motion to suppress five wiretaps. *Castillo–Garcia*, 117 F.3d at 1182. The third wiretap application was directed towards two different telephone numbers assigned to paging devices: one device used by an individual named Castillo–Garcia and a second device used by an individual named Olivas–Sanchez. *Id.* at 1193. The Tenth Circuit found that although the Government made a showing of necessity as to the first telephone number, it had not made a similar showing as to the second. *Id. Castillo–Garcia* is easily distinguishable from the case at bar. In *Castillo–Garcia*, the Government submitted an application to intercept communications on two separate devices used by two different individuals. Here, each of the Government's applications sought to intercept communications from only one telephone number at a time. Therefore, it does not follow that because the Tenth Circuit required the Government to make a showing of necessity as to two different devices in one single wiretap application, then Title III also requires the Government to make a showing of necessity as to each individual named in a wiretap application. To hold otherwise would be contrary to the Fifth Circuit's approach to determining whether Title III's necessity requirement has been satisfied. For example, in cases with several co-conspirators, the Fifth Circuit is not concerned with whether an application makes a showing of necessity as to each individual likely to be overheard in the intercepted communications. *See, e.g., Hyde*, 574 F.2d at 868. Rather, the Fifth Circuit's analysis regarding necessity focuses on "defendants," not one defendant in particular, and on "conspirators," not any conspirator individually.[20] *Id.* Without more, the Court finds that Title III does not require the Government to make a showing of necessity as to each individual likely to be overheard in an intercepted communication. Having so decided, the Court now examines each contested wiretap application to determine whether the Government made a sufficient showing of necessity to warrant granting an order authorizing a wiretap.[21]

---

**19.** Defendants fail to explain how *Castillo–Garcia* supports their argument. Therefore, the Court is left to make the best case in their favor.

**20.** The following is an excerpt from the Fifth Circuit's analysis in which it found that the Government had satisfied the necessity requirement: "Normal physical surveillance of the *defendants* was used extensively by the agents. It was apparent from the *suspects'* behavior, and from information provided by confidential informants, that the *conspirators* were on their guard against ordinary surveillance, and it proved largely fruitless. The *conspirators* used citizens' band radios to monitor the whereabouts and activities of law enforcement officers. The affidavit alleges that the *conspirators* knew that they were suspected and were doubly careful to guard against being observed." *Hyde*, 574 F.2d at 868 (emphasis added).

**21.** Defendants do not contest the Government's showing of necessity in the September 2011 wiretap. Therefore the Court does not address it below.

### B. Whether the Government made a showing of necessity in each application/affidavit

In determining whether the Government has satisfied §§ 2518(1)(c) and (3)(c), the Fifth Circuit explains that the necessity requirement "must be read in common sense fashion," *United States v. Robertson*, 504 F.2d 289, 293 (5th Cir. 1974), and "against flexible standards" with "each case . . . examined on its own facts." *Hyde*, 574 F.2d at 867. "[C]ourts are reluctant to impose their hindsight upon law enforcement agencies, and the proponents of the application need not establish that every other imaginable mode of investigation would be unsuccessful." *Guerra–Marez*, 928 F.2d at 670; *see also United States v. Edwards*, 124 F.Supp.2d 387, 400 (M.D.La.2000) ("The government need not prove exhaustion of every conceivable option before a wiretap order may issue.") Indeed, "courts will not invalidate a wiretap order simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not." *Hyde*, 574 F.2d at 867. "It is enough if the affidavit explains the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves." *Id.* The Court now evaluates the May 2011 wiretap affidavit to determine whether the Government has shown that the wiretap was necessary.

### i) May 2011 wiretap affidavit

In May 2011, the Government sought an order to intercept communications over TT–1 used by Cabral. In its May 2011 wiretap affidavit, the Government discussed nine different normal investigative procedures used before agents sought an order authorizing a wiretap. The investigative techniques included the use of confidential informants; the use of undercover agents; physical surveillance; pole cameras; GPS devices/vehicle track-ers; search warrants; interviews; grand jury subpoenas and immunity; trash searches; other wiretaps; and financial investigations. Defendants make several objections as to the Government's showing of necessity.

As to confidential sources, the affiant explained that although CS–1 successfully gathered intelligence and gained Cabral's trust, CS–1's success did not obviate the need for a wiretap. Madrid argues that "[r]ather than explaining why CS–1 can no longer be of service, the agent resorts to a general explanation of specific methods used by some drug traffickers that make it difficult for confidential sources to be used." Yet, the Court finds that the affidavit does establish CS–1's limitations. Indeed, one of the main goals of the investigation was to identify the target subjects' co-conspirators who were distributing narcotics and laundering money. The affiant explained, however, that CS–1 did not know the drug traffickers working with Cabral and did not have access to Cabral's drug contacts in the United States or in Mexico. The affiant also explained that CS–1's life could be in danger were s/he to make such inquiries. Furthermore, the affiant explained that since April 2011, Cabral has failed to answer CS–1's phone calls and only communicates with CS–1 through Facebook. Finally, the affiant averred that each time CS–1 inquired about drug transactions over Facebook, Cabral did not respond. The Court finds that these examples make clear that CS–1's continued utility in this particular investigation was limited, notwithstanding the useful information s/he may have provided earlier on in the investigation.

Defendants also challenge the Government's showing of necessity on grounds better suited to a probable cause challenge. For example, Ruvalcaba's counsel of record states that "[i]t is the under-

signed's belief that CS–1 is a female who may have been in a dating relationship with XX that has turned sour and this could be a legitimate reason that XX has refused to answer phone calls." Yet for purposes of determining whether the wiretaps are necessary, Cabral's reasons for not communicating with CS–1 are irrelevant. Indeed, the fact that CS–1 no longer communicated with Cabral—for whatever reason—supports the Government's position that CS–1 was limited in his/her ability to gather additional intelligence and that therefore, a wiretap was needed to further the goals of the investigation.

Likewise, Madrid avers that "most of the examples offered in support of the need for a wiretap are potentially legitimate activities that could be conducted by people not involved or not desirous of being involved in illegal conduct." Madrid cites the affiant's discussion of the use of physical surveillance as a case in point. In that section of the affidavit, the affiant explained that although physical surveillance had helped agents identify suspected associates and their respective residences, physical surveillance has some limitations. For example, the affiant averred that conducting surveillance of Cabral's hot dog business had been difficult for many reasons, including: 1) business is not open during the day; 2) the business is located in a strip mall which affords its occupants privacy; and 3) the business's size and location make it difficult to observe individuals entering the shop. Furthermore, the affiant indicated that surveillance could be more effective with the aid of wiretaps insofar as information from wiretaps could help direct surveillance resources. Finally, the affiant provided an example of where surveillance yielded limited information:

[O]n April 27, 2011 agents observed [Cabral] leave his residence and drive to [the hot dog business] ... and give something to an unknown individual who was observed coming out of the back of the restaurant. Agents were unable to determine what was given to the individual. Your affiant asserts that agents were unable to surveil behind the restaurant because [Cabral] would have detected their presence. Your affiant asserts that [Cabral] utilizing the area behind the restaurant suggests that he is surveillance conscious.

Madrid argues that this example somehow shows that a wiretap was not necessary because "[t]he "something" mentioned ... could have been a key to the restaurant or some other legal item." Far from showing that a wiretap was unnecessary, the fact that agents were unable to ascertain whether that "something" was something legal or not only bolsters the affiant's argument that physical surveillance in the back of the hot dog business was limited. With respect to this same example, Ruvalcaba asserts that agents should have conducted a traffic stop and sought a consensual search of the individuals leaving the hot dog business to determine their identities and what was exchanged. As already mentioned, however, "courts will not invalidate a wiretap order simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not." [22] *Hyde,* 574 F.2d at 867.

Defendants also aver that the affiant misstates facts in the affidavit. For example, as to pole cameras, the affiant explained that while agents have never used them, they have not ruled them out in monitoring Cabral's hot dog business.

---

**22.** Ruvalcaba also takes issue with the fact that agents never employed GPS before applying for the wiretap. This argument is of no avail for the same reason related to *post factum* arguments articulated above.

Moreover, the affiant explained that among other things, pole cameras were of limited utility in this investigation because they are "adversely affected by inclement weather and the heavy winds common to the El Paso, Texas region." Ruvalcaba's attorney of record states: "This is incorrect and a misstatement by the affiant as the undersigned is aware of cases, where these blanket statements unsupported by any specific facts, are not correct and pole cameras in the Southwest have provided valuable intelligence." Ruvalcaba's argument is unpersuasive. Simply because pole cameras have worked in other parts of the Southwest does not mean that they work well in El Paso. Moreover, even if pole cameras have worked in other situations, the Court finds that the affidavit makes clear that they may not be effective in this particular investigation because of their limited ability to record vehicle license plates and to accurately capture the faces of individuals entering and exiting locations. It is reasonable to believe that a camera sitting on top of a telephone pole may not be the most effective tool for an investigation whose goal is to learn the identities of other members of a conspiracy.

Defendants also contest the wiretap's necessity section because it contains contradictions and inconsistencies. For example, Defendants make much ado about the Government's use of the word "obviate." Ruvalcaba's Motion to Reconsider provides: "The affidavit states that 'CS–1 has been successful in gathering intelligence and gaining the trust of XX ... but [sic] the very next line the affiant contradicts himself by saying that 'CS–1's involvement does not obviate the need for a wiretap.'" The Court sees nothing inherently contradictory between these two statements. Indeed, the fact that CS–1 provided useful information does not preclude, i.e., obviate, the need for a wiretap.

Moreover, Ruvalcaba finds contradictions in the section related to interviews. The affiant stated that agents have interviewed witnesses, but many of the interviewees have refused to speak. For example, after Pizarro was arrested for attempting to smuggle marijuana into the United States, he refused to speak to agents about the source of marijuana. Regardless, "an interview of the Target Subjects would produce insufficient information of all of the persons involved in the conspiracy, including ... the suppliers ... the transporters ... the customers ... the narcotics supply routes ... [and] the modes by which the organization imports and distributes narcotics," among other information. Moreover, the affiant explained that "couriers, like Pizarro, rarely have access to multiple people in a [drug trafficking organization]" because they "routinely know only their recruiter and a[re] purposely kept separate from more senior people in the [drug trafficking organization]." Ruvalcaba attacks this section of the affidavit by stating that it cannot be reconciled with the fact that a May 21, 2011, interview with Casas revealed that Cabral paid him to smuggle marijuana into the United States. Nevertheless, Casas's interview is consistent with the affiant's explanation of a courier's limited knowledge of the drug trafficking organization's workings. Indeed, Casas, a courier, was unable to provide the Government with information regarding suppliers, supply routes, and other matters.

Finally, Defendants argue that the necessity section is speculative. For example, in explaining that trash searches were unsuccessfully conducted in April 2011 on Cabral's residence at approximately 4:00 a.m., the affiant swore as follows:

As agents were leaving the residence, the lights on the porch were turned on and off a number of times. It is believed the residents of the house were aware of agents [sic] presence outside. Your affiant asserts that the response of those inside the home suggests that Cabral is surveillance savvy.

Madrid challenges this paragraph as mere speculation. Nevertheless, the affiant is not prevented from drawing inferences from his/her observations. It was certainly reasonable to infer that lights going on and off at 4:00 a.m. while agents were conducting a trash search could have indicated that Cabral was surveillance savvy.

Having reviewed the affidavit's necessity section in its entirety, the Court finds that under a common sense, flexible standard, there were more than enough facts for Judge Cardone to find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C.A. § 2518(3)(c). The Court now briefly determines whether the June and July 2011 wiretap affidavits include sufficient additional facts to satisfy the necessity requirement on their own.

### ii) *June and July 2011 wiretap affidavits*

▅▅▅▅ Defendants argue that the June and July 2011 wiretap affidavits are deficient because the Government merely bootstrapped its necessity showing from the May 2011 affidavit onto the June and July 2011 wiretap affidavits. While "mere boilerplate recitation of the difficulties of gathering usable evidence" will not satisfy Title III's necessity requirement, *United States v. Leavis*, 853 F.2d 215, 221 (4th Cir.1988), a combination of boilerplate and case-specific information does. *See, e.g.,* *United States v. Campos*, 541 F.3d 735, 749 (7th Cir.2008); *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir.1977). Indeed, the Government is not prohibited from using boilerplate language as long as it also provides "additional new information in each successive affidavit, which [is] sufficient to justify the issuance of each of the wiretap authorizations." *Campos,* 541 F.3d at 749; *see also United States v. Oriakhi,* 57 F.3d 1290, 1298 (4th Cir.1995) ("While the several affidavits for the various wiretaps involved may have relied on the same facts, their recitation was not boilerplate."); *Castillo–Garcia,* 117 F.3d at 1190. The Court now determines whether the additional facts in the June and July 2011 wiretap affidavits amount to a showing of necessity.

The June 2011 wiretap affidavit contains many additional facts. As to confidential informants, the June 2011 wiretap affidavit includes information about CS–2. For example, although CS–2 provided ATF agents information about Alcalá and the acquisition and storage of weapons, CS–2 did not know the drug traffickers Alcalá worked with and had been unable to identify higher-level members of the organization. Regarding physical surveillance, the affiant explained that physical surveillance had been difficult because the targeted subjects used bars that were frequented by drug traffickers. Moreover, the agents explained that conducting surveillance at a bar can be difficult. For example, on June 7, 2011, agents tracked Alcalá to a bar. When agents attempted to locate him inside, they were unsuccessful. Moreover, the affiant provided examples of instances in which agents were able to track Alcalá down but then were unable to determine whether a transaction had taken place. Regarding pole cameras, the affiant indicated that a pole camera was installed outside Cabral's residence, but the camera had not provided enough intelligence to warrant the risk of Cabral identifying the camera. With respect to tracking, the affi-

ant explained that GPS devices and vehicle trackers were of limited utility because Alcalá used two vehicles to conduct suspected drug transactions with Cabral. Finally, the affiant indicated that a trash search was conducted on Alcalá's residence on June 10, 2011. Nevertheless, the affiant explained that agents were unable to take curbside the trash placed in front of the house as an unknown individual was standing in the door-way of the house next door. In short, there were more than enough facts for Judge Cardone to find that "normal investigative procedures ha[d] been tried and ha[d] failed or reasonably appear[ed] to be unlikely to succe[ed] if tried or to be too dangerous." 18 U.S.C.A. § 2518(3)(c).

As to the July 2011 wiretap affidavit, many additional facts were also provided that were not available in the June 2011 affidavit. For instance, under the confidential source section, the affiant explained that CS–2 was co-Defendant Cereceres. CS–2 was of limited use to the investigation because, although he provided information about Alcalá, he continued to work with Alcalá during the previous interception period. The July 2011 wiretap affidavit also explained that undercover agents were of limited use. CS–1 had begun to associate him/herself with Alcalá but each time CS–1 was with Alcalá, Alcalá had to vouch for him/her. The affiant explained that "[d]rug traffickers usually 'vouch' for someone they trust to their associates and superiors. Based on the fact that ALCALA is having to do this, I do not believe CS–1 would be able to successfully introduce another individual because ALCALA would not 'vouch' for CS–1's friend (undercover agent)."

Additionally, the July 2011 affidavit also indicated that agents extensively used physical surveillance on Alcalá, Ruvalcaba, and Cereceres. The affiant further indicated that pole cameras had been requested at Alcalá's residence because he had been storing tires used to smuggle narcotics at his home. Agents had not yet installed the cameras because at the time of the affidavit, agents lacked the equipment. Nevertheless, the affiant stated that although Alcalá stored tires at his residence, there were other stash houses in the drug trafficking organization. The affiant also indicated that agents attempted to obtain a search warrant for a tire shop, but prior to obtaining the warrant, Alcalá moved the narcotics-filled tires to a different location. The affiant swore that even "if search warrants were obtained and executed . . . they would [not] provide . . . sufficient evidence necessary to determine the full scope of the criminal activities, the various methods being used by the members of the organization, and the identities of those involved." The affiant also averred that grand jury subpoenas have issued on bank accounts associated with members of the trafficking organization but that the information would only be a snapshot of the banking information of certain individuals. Finally, the affiant provided examples of how interviews were limited. For instance, the affiant relayed that the interview with Cereceres had not been fruitful because "he ha[d] attempt[ed] to insulate himself from prosecution by be-friending law enforcement" officials. Specifically, Cereceres had denied meeting with Alcalá even though surveillance has observed the two together. Having evaluated the entire affidavit, the Court finds that under a common sense, flexible standard, there were more than enough facts for Judge Cardone to find that "normal investigative procedures had been tried and had failed or reasonably appear to be unlikely to suc-

ceed if tried or to be too dangerous." 18 U.S.C.A. § 2518(3)(c).

## CONCLUSION

The Court finds that Defendants' Motions to Suppress and Motions to Reconsider should be denied. First, neither the Fourth Amendment nor Title III require the Government to make a showing of probable cause as to each and every defendant. Second each wiretap affidavit contained sufficient facts for Judge Cardone to have found probable cause as required by the statute. Third, Title III does not require a showing of necessity as to each individual named in the wiretap application and affidavit, and the first, second, and third wiretap affidavits made a sufficient showing of necessity. Therefore, the Court finds that the following Orders should enter:

IT IS HERBY ORDERED THAT Defendant Jesus Madrid's Motion to Suppress is **DENIED.**

IT IS FURTHER ORDERED that Defendant Billy Omar Ruvalcaba–Madrid's Motions to Suppress is **DENIED.**

IT IS FURTHER ORDERED that Defendant Jesus Madrid's Motion to Reconsider is **DENIED.**

IT IS FINALLY ORDERED that Defendant Billy Omar Ruvalcaba–Madrid's Motion to Reconsider is **DENIED.**